IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ZUHDIJA NAPRELJAC,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>JOHN Q. HAMMONS HOTELS, INC.,<br>d/b/a EMBASSY SUITES,<br><br>　　　　Defendant. | No. 4:05-cv-00160-JEG<br><br>ORDER ON MOTIONS<br>TO DISMISS AND FOR<br>SUMMARY JUDGMENT |

This matter comes before the Court on a Motion to Dismiss and Motion for Summary Judgment filed by Defendant John Q. Hammons Hotels, Inc. (Clerk's No. 30), and a Motion for Partial Summary Judgment filed by Plaintiff Zuhdija Napreljac (Clerk's No. 31). Plaintiff Zuhdija Napreljac is represented by Bruce H. Stoltze. Defendant John Q. Hammons Hotels, Inc., is represented by Paul D. Seyferth, Joseph H. Knittig, Brent N. Coverdale, Thomas W. Foley, and Mary E. Funk. A hearing on the pending motions was held on August 18, 2006. These matters are fully submitted and ready for disposition. The juxtaposition and interplay of the facts and the law related to the claims and arguments presented compel a detailed factual and legal analysis.

## SUMMARY OF MATERIAL FACTS

### I.    Introduction.

Plaintiff Zuhdija Napreljac is an alien resident from Bosnia living in Waukee, Iowa, who holds a green card,[1] making him eligible to reside and work in the United States. Napreljac

---

[1] Although the parties refer to a "green card," they apparently mean either an alien registration receipt card or a certificate of alien registration issued by the Bureau of Citizenship and Immigration Services. See Immigration and Nationality Act, ch. 7, § 264, 66 Stat. 224 (1952) (current version at 8 U.S.C. § 1304(d) (2006)) (providing that certain aliens "shall be issued a certificate of alien registration or an alien registration receipt card").

worked at the Embassy Suites, a Des Moines hotel owned by Defendant John Q. Hammons

Hotels, Inc. (hereinafter, "JQH"), from September 2000 until his termination on September 24,

2003.  Napreljac was an engineer for JQH.  A "position description" lists the physical demands

for the position as follows:

> Heavy work:  Exerting 50 to 100 pounds of force occasionally (Occasion-
> ally:  activity or condition exists up to 1/3 of the time), and/or 25 to 50
> pounds of force frequently (Frequently:  activity or condition exists from 1/3
> to 2/3 of the time), and/or 10 to 20 pounds of force constantly (Constantly:
> activity or condition exists 2/3 or more of the time) to move objects.

Pl.'s App. 14.  Napreljac's duties included collecting trash around the hotel on a rotating basis

with other engineers, inspecting and repairing items in hotel rooms, and conducting other general

maintenance tasks around the hotel.

For a portion of 2003, Napreljac was the person performing the hotel's Holi-Care pro-

gram, a maintenance program focusing on long-term maintenance tasks in the hotel rooms, such

as caulking around plumbing fixtures and repairing larger objects.  When Napreljac was able, he

performed this maintenance for three rooms daily, but when physical restrictions were imposed

on Napreljac following certain workplace injuries, these duties were not performed.

Engineers like Napreljac report to the hotel's chief engineer to obtain work tasks.  For a

time during Napreljac's employment, the chief engineer position was vacant, so Napreljac

reported to Scott Johnston.  Johnston was a lead engineer but performed the duties of the

chief engineer.[2]

Kevin Beaver was the director of housekeeping and was responsible for the cleanliness of

the hotel.  Beaver drafted work orders filled by engineers and returned as proof repairs were

---

[2] The record indicates at this facility a lead engineer is an assistant chief engineer.

completed.  Although the Holi-Care program was typically managed by the chief engineer, Beaver was trusted with its oversight for a portion of Napreljac's employment.

Jayne Schmeling became the hotel's human resources manager on September 8, 2003, just over two weeks before Napreljac's employment ended.  Schmeling's duties included recruiting and hiring new employees, administering the hotel's payroll, and providing orientation for new employees.  Jane Postier had previously served as the human resources manager at the Embassy Suites and another hotel, but Postier had shifted her focus away from the Embassy Suites when Schmeling was hired.  Because Schmeling was a new hire, Postier was training Schmeling when Napreljac was terminated.

Shannon Kaufman began at the hotel in 1998, became assistant general manager in 2000, and was promoted to general manager in 2003.  As general manager, Kaufman oversaw certain aspects of the hotel's budget and administered operations of the entire hotel.  She was vested with the power to hire employees and was the sole person capable of terminating employees.  She was not involved in the decision to hire Napreljac but was responsible for his termination.

## II.    Napreljac's Employment at JQH.

Napreljac enjoyed favorable performance reviews from the beginning of his employment.  A December 2000 review indicated he was "highly successful."  In September 2001, he was again rated "highly successful."  His third and final review, created in August 2002, reflected a "successful" rating.  Napreljac's next review was to occur sometime in September 2003 but had not yet been completed at the time of his termination.  Throughout his employment, Kaufman "never had any problems with" Napreljac, describing him as a good worker.  Kaufman Dep. 128:1-17, Apr. 5, 2006.  Napreljac's co-workers' opinions are in accord.  See Johnston Dep.

29:14-30:5, Apr. 6, 2006; Postier Dep. 37:24-38:3, Apr. 6, 2006; see Def.'s App. 289 (evaluating

Napreljac as "industrious and . . . interested in moving forward").

### A.   Napreljac's Workplace Injuries in November 2001 and August 2003.

On November 9, 2001, Napreljac injured his neck and back while moving a wet piece of

carpet at work.  He underwent neck surgery in January 2002 related to this injury.  When he

returned to work in February 2002, he was subject to a twenty-five pound lifting restriction and a

reaching restriction that his physicians believed was necessary for four weeks.  A letter prepared

by a physician on May 23, 2002, indicates Napreljac's neck injury had reached "maximum

medical improvement" by May 1 but warranted an 8 percent impairment rating, and that his back

injury was "degenerative in nature" and did not "warrant an impairment rating."  Pl.'s App. 30.

Records indicate continued pain from this injury.  Notes from treatment in August 2002 indicate

Napreljac suffered pain but that certain functional tests were invalid because Napreljac exhibited

"submaximal effort."  Pl.'s App. 32.  A film of Napreljac's spine evaluated in February 2003

was normal but pain lingered.  A bone scan and another test performed in March 2003 were

normal, excepting deficiencies consistent with his surgery.  Notes prepared in June 2003 indicate

Napreljac continued to experience discomfort but was able to work on a full-time basis.  During

this time frame, Napreljac's "boss told [him] to do whatever [he] felt like being able, capable of

doing, and whatever [he] couldn't do, [he] was supposed to write a note about it."  Pl.'s Dep.

76:5-8, Feb. 23, 2006.  Napreljac would leave work early if he felt pain.

Napreljac's physicians released him from all work restrictions on March 6, 2003.  Still,

there were some aspects of his work he could not complete without help.  The record does not

reveal what specific duties he was incapable of performing, but Napreljac testified that if he

needed help, "[he] would ask others for help, and they would always have someone help [him]."

Pl.'s Dep. 77:16-20, Feb. 23, 2005.  On August 1, 2003, when Beaver noted deficiencies in

certain repairs Napreljac performed, Napreljac reported "some parts of his job were too hard and

that he could not do the work."  Pl.'s App. 22.

On August 4, 2003, Napreljac injured his back at work.  Notes prepared by Napreljac's

treating physician indicate chronic neck and back pain, but tests designed to determine if work-

place restrictions were appropriate were invalid because of insufficient effort on

Napreljac's part.

Napreljac returned to work on August 5, 2003 but could not lift over ten pounds, bend

more than ten times per hour, or push or pull over ten pounds of force.  He was to undergo

physical therapy three times weekly and perform certain therapeutic exercises.  A memorandum

prepared by Johnston on August 5 indicates Napreljac "complain[ed] of back problems and work

overload" and could not do some tasks such as move furniture or reach overhead.  Pl.'s App. 23.

Restrictions put in place on August 7 barred Napreljac from lifting over five pounds, pushing or

pulling over ten pounds of force, and bending more than five times each hour.

Napreljac was placed on "light duty" status at JQH.  JQH materials define light duty

work as follows:

> The Company offers a light-duty program to help Associates injured on the
> job with temporary conditions to get back to work sooner.  The light-duty
> program allows temporarily disabled Associates to return to work before
> they are ready to return to their original positions or duties.
>
> The light-duty program is set up as a transitional program for workers who
> are expected to return to full duty at their original jobs.  It is not intended to
> accommodate Associates with non-temporary disabilities.

Pl.'s App. 5 (emphasis added).  When on this program, Napreljac picked up litter for about one hour each morning and then folded towels in the hotel's laundry department.  This work was typical for engineers on light duty.

JQH had few problems accommodating Napreljac's physical restrictions, including his inability to perform the Holi-Care program; he was merely assigned to tasks within his physical restrictions.  Napreljac relayed that he was not told he was doing his job improperly and, in his opinion, was capable of adequately performing his job duties.

**B.    Napreljac's Incident on September 18, 2003, and the Resulting Investigation.**

On September 18, 2003, Napreljac began work at 8:00 a.m.  His first task was to pick up litter around the hotel's property using a litter collecting device and a trash can resting on a cart equipped with wheels.  At around 8:30 a.m., Napreljac claims he was descending a staircase located at the east loading dock of the hotel when he hurt his back.  Whether Napreljac aggravated an old injury, was injured anew, or was not injured at all, as well as the timing, extent, and nature of his injuries is of considerable debate.

Sometime around 8:30 a.m., Kaufman directed Johnston to deliver a note to Napreljac about an appointment with a physician scheduled for September 25, 2003.  Johnston found Napreljac on the east loading dock at around 8:45 a.m.  Napreljac was picking up litter.  After handing Napreljac the note, Johnston recalled the following exchange:

> A:    . . . . When I gave – when I handed him the note, he immediately said that his back had been bothering him that day.  I first asked him if he would like to go home for the day.  He told me no.  And then I said, "Well, how bad is your" – you know, just small talk – "How bad is your back hurting?"
> He told me, "Oh pretty bad."

> You know, "Where is it," hurting stuff like that.  And I said "Well,
> hopefully this doctor that we are sending you to will be able to correct
> your problems."

Johnston Dep. 39:2-14; see Unemployment Ins. Appeals Bureau Hr'g Tr. 39:12-16 ("He told me

that his back had been hurting him a lot lately.  He said it even hurts to walk.  And I, I just, I

talked to him about a doctor's appointment.  I said, 'I hope your doctor's appointment on the

25th that they can resolve your accident, or give you some sort of help whether it be cortisone

shots, medicine, or chiropractic therapy.'").  Johnston does not remember Napreljac saying he

received any injuries on the east loading dock steps, and Napreljac did not say he was injured

while walking down the steps.  The two smoked cigarettes and went on with their job duties.

Napreljac went back into the hotel and continued folding towels.  The exchange between

Johnston and Napreljac lasted ten to fifteen minutes.

　　　When Napreljac arrived in the hotel's laundry facility, Beaver – Napreljac's supervisor in

the laundry facility – asked Napreljac how he was doing, an apparent routine.  Beaver testified

Napreljac "said he didn't feel too good, that he hurt his back, slipped and fell."  Beaver Dep.

23:10-11, Apr. 10, 2006; see also Unemployment Ins. Appeals Bureau Hr'g Tr. 36:21-31.  When

Beaver asked where Napreljac had fallen, Beaver recalls Napreljac indicated he had fallen on the

loading dock.  Beaver recollects Napreljac said his fall occurred at around 8:30.  Napreljac did

not ask to see a doctor, did not ask to leave work, and did not ask to make a workers' compensa-

tion claim; instead, he folded towels.  Napreljac denies having told Beaver that he had fallen.

　　　JQH employees are trained to immediately report to a supervisor any injuries incurred at

work.  Because Beaver oversaw the area where Napreljac was working, Napreljac's report of any

incident would correspond with his training.

Shortly after Beaver and Napreljac conversed, Beaver spoke with either Postier or Schmeling (he does not recall) to begin an accident investigation.  Schmeling recalled receiving a call from Beaver, relaying Napreljac had slipped and fallen.  Upon receiving the call, Schmeling and Postier went to where Napreljac was working, one of them bringing a form to document the accident.  Postier recalled the following upon arrival at the hotel's laundry:

> And so we went to check on [Napreljac], and I approached [Napreljac], you know "What happened?"
> And he said "I've fallen," you know.
> And, you know, "Where?  Show us.  How did you fall, and what happened?"  And so then when we went out to the back dock, the stair area where he said it had happened . . . .

Postier Dep. 10:21-11:5; see Postier Dep. 11:10-12:8.  Schmeling's recollection is in accord.

> Q:   What did he say?
> A:   He indicated by grabbing his back that his back hurt, and he agreed to take us to the location of where it happened.

Schmeling Dep. 10:9-12, Apr. 6, 2006.  When the quartet arrived at the loading dock, Napreljac was asked to demonstrate how he had fallen.  At this point, witnesses' memories begin to diverge.

Schmeling testified as follows:

> Q:   What did he say happened?
> A:   He said that he was picking up trash on the back loading dock.  He was going down the steps.  He took a step, and that caused his back to hurt.
> Q:   Did he say anything else about how it happened?
> A:   He demonstrated going down the steps.
> . . . .
> A:   He was on the steps.  He showed us the loading dock steps, and he showed us that he was going down the steps.  So he demonstrated going down the steps.  He took a step with his right foot and said that when he took the step that his lower back – that he felt pain in his back.

Schmeling Dep. 10:13-17; 11:15-21.  She recalled that Napreljac did not initially say he was collecting litter but when asked said he was.  According to Schmeling, Napreljac did not demonstrate or say that he had fallen.

Schmeling became suspicious of Napreljac's story because,

> when [she] had received the call from [Beaver] . . . he said he had fallen. . . . And when [Napreljac] talked about and demonstrated what he had done, he had not fallen.  He said he stepped wrong.  So there was some confliction [sic] as to whether did you fall or did you not fall.  And he indicated he stepped wrong when we were investigating.

Schmeling Dep. 16:9-16.  Schmeling reported these discrepancies to Kaufman:

> A:   . . . .  He said he had fallen.  And when we did the investigation, he said he did not fall, that he stepped wrong.
> Q:   Did you tell her that in your opinion it was a false report of a worker compensation injury?
> . . . .
> A:   I don't know if I would have used that language.  I don't believe he had hurt himself to how he said he had hurt himself.
> Q:   Why do you believe [that]?
> A:   First he said he hurt himself by falling, and we determined that he didn't fall, because he changed his story.  He changed his story to say that he stepped wrong.

Schmeling Dep. 45:22-46:20; accord Schmeling Dep. 57:6-8.  Schmeling admitted that the sole basis for her belief that Napreljac had fallen was Beaver's call and a memo Beaver had prepared.

According to Beaver, Napreljac "explained . . . and pointed out, but he would not – he could not do a demonstration because his back hurt," but he did "walk[] down the stairs and kind of explain[] how he was doing it."  Beaver Dep. 28:13-21.  Beaver elaborated,

> A:   . . . . [H]e demonstrated to us as he was walking down the stairs grabbing on the handrail where he slipped and fell about halfway down the stairwell.
> . . . .
> A:   He went down to about midway to show us where he slipped and fell.
> . . . .

9

Q:   Okay.  But he continued to assert that he had fallen down in
     that demonstration?

A:   Yes.

Q:   Did he indicate that he had grabbed the handrail as he was walking
     down and had fallen while holding on to the handrail?

A:   He indicated that he was holding the handrail.

Q:   When he was – when he had fallen?

A:   When he was going down.

Q:   Did he indicate whether he had fallen all the way down and hit the
     stairs, then, when he fell?

A:   He mentioned that he had fell [sic] to his right side, onto his right side
     at the end of the stairs.

Q:   He had fallen to his right side; is that correct?

A:   When he landed on the floor.

Beaver Dep. 29:17-30:25; see Pl.'s Supp. App. Ex. Z, at 02:35-02:50 (containing Beaver's

demonstration).  Beaver did not remember Napreljac saying he was engaged in any particular

sort of activity – such as picking up litter – but merely said he slipped when descending the

stairs.  According to Beaver, Napreljac maintained throughout his demonstration that he

had fallen.[3]

    Postier's recollection varies:

---

[3] At Kaufman's request, Beaver documented his conversation in a memorandum, which
reads as follows:
     On Thursday September 18, 2003, I asked [Napreljac] how he was doing.  He
     said the following to me at approximately 9:08am:
     [Napreljac:]  I am not feeling to [sic] good.  I slipped and fell.  Now my back
     hurts worse and my neck hurts.
     [Beaver]:  How did you fall?
     [Napreljac]:  I stepped wrong.
     [Beaver]:  Where did you fall?
     [Napreljac]:  I fell on the stairs going out the employee entrance, near the
     grease trap.
     I asked if he felt he needed to sit down for a few minutes.  [Napreljac] said that he
     thought he would be OK.  After this, I called [Schmeling] to inform her of the
     accident so that we could complete an investigation.
Def.'s App. 194.

A:   It was kind like [sic] he said he stepped and then went like that (indicating).  And I said, "Did you grab" – you know, because I remember the railing was right there.  And I remember I was thinking, did you grab the railing, you know, to grab yourself?  "No, no, no, no. I, you know, slipped and went like this" (indicating).  And then it was – you know, hurt the back, hurt the back.

. . . .

A:   The way I remember it is that he showed us the step that he said that he fell [sic] and then (indicating), you know, with the other leg, went like that (indicating).

. . . .

Q:   All right.  And did he demonstrate that he fell all the way to the ground?

A:   No.

Q:   What did he demonstrate?  He just demonstrated that he went back?

A:   Yes.

Q:   Did he demonstrate how he caught himself from falling?

A:   No.  And that's when I had asked him.  "Did you, you know, grab the railing?"
"No, no."

Q:   Well, when he was demonstrating this to you on those steps, did he say that he fell, or did he say that he stepped wrong?

A:   At first it was fell, and then it turned into slipped.  "I slipped.  I slipped," because when – I was like, "Did you grab onto the railing, you know, when it happened?"
"No, no, no, I slipped."

Postier Dep. 12:16-24; 24:24-25:24; Pl.'s Supp. App. Ex. Z, at 05:06-05:26 (containing Postier's demonstration).  Postier concluded Napreljac changed his story from saying he had "fallen" to saying he had "slipped" as the investigation proceeded.

After the demonstration, Schmeling testified that she, Napreljac, Beaver, and Postier began filling out an accident report form.  Accident report forms are intended to guide investigations and prevent similar incidents in the future.

JQH's accident report form is comprised of five sections.  Section one is labeled "accident data" and contains blanks to indicate the employee involved, the location and time of the accident, and the identity of any witnesses.  Section two contains spaces for the "analysis of facts

and root cause(s) determination" and provides room for the employee to describe the accident, equipment used in the accident and the body parts injured, as well as what is determined to be the "root cause." Section three lists "corrective action" taken. The first three sections are to be completed by the employee's supervisor.[4]

Section four contains a box for an "action plan to eliminate root cause(s)" and is to be completed by an accident investigator. Section five lists certain employee information supplied by the human resources department. The accident report form prepared by JQH after Napreljac's September 18 incident has sections one, two, and five completed.

Schmeling completed sections one and two of the accident report form. Under "description of the accident," the following language appears: "R lower back – radiating pain of [sic] buttocks & leg R – employee stated made worse from previous injury of 8/4/03." Def.'s App. 196. In the box labeled "employee description of accident," Schmeling wrote "walking down the steps picking up garbage." Def.'s App. 196. And under "activity/job at time of accident," the form states Napreljac was "picking litter on steps [and] stepped wrong." Def.'s App. 196. The accident report form does not indicate Napreljac slipped or fell. According to Postier, the form was not inconsistent with what Napreljac said or demonstrated.

The accident report form contains a signature below the space for the employee's description of the accident. Whether it is Napreljac's signature is an issue of dispute. Testimony from Schmeling in a separate proceeding indicates she, Postier, and Beaver witnessed Napreljac sign the form. At her deposition, however, Schmeling testified that only she and Postier

---

[4] Because Johnston was Napreljac's supervisor, he was tasked with reading and signing an accident report created following an investigation into Napreljac's September 18 incident. Johnston also prepared a memorandum at Kaufman's request to document his interactions with Napreljac. Johnston's memorandum is consistent with his deposition testimony.

witnessed Napreljac sign it.  Beaver and Postier deny seeing Napreljac sign the form, and

Napreljac denies the signature is his.

Kaufman, the hotel's general manager, was kept informed.

> I went to, I believe, both . . . Schmeling and . . . Postier, and they were
> handling the investigation with [Beaver].  I asked what had happened, and
> they said that [Napreljac] had hurt himself on the stairs.  At that point then
> they started filling out the accident [report form].  I went and talked to
> [Beaver] about it, you know, how did this come about, spoke to [Beaver].
> [Beaver] told me what he – the conversation they had had.  And then I went
> to the video.

Kaufman Dep. 53:7-17.

As with many areas of the hotel, a security camera records events on the loading dock.

The parties have submitted a copy of the video footage created on the morning of September 18.

Pl.'s Supp. App. Ex. Y.  Neither the quality nor the continuity of the tape is pristine.  It is grainy

and records about one frame every second.  Nevertheless, JQH employees had much to say after

reviewing the tape.

Kaufman testified that the tape showed Napreljac in the hotel's parking garage picking

up litter a little after 8:00 a.m.  Napreljac is next seen in the employee's smoking area – by the

east dock – smoking and picking up litter.  Beaver testified that the videotape is inconsistent with

Napreljac's story because it "[s]howed that [Napreljac] was nowhere on – not on the back dock

at [around 8:30], the time that he said he slipped and fell on the back dock.  And later the [sic]

day it showed him going down the stairs with ease and then jumping into another employee's car

and moving the car for her."  Beaver Dep. 36:8-13.  From what Postier could see, "it looked like

. . . he did not slip or fall.  And he [later] hopped into an employee's vehicle and went and parked

it."  Postier Dep. 14:21-24.  Postier testified that "it seemed like there was some misrepresenta-

tion" because of discrepancies between what Napreljac had reported and what the videotape

13

showed.  Postier Dep. 23:9-17.  Schmeling's review of the tape showed Napreljac was not picking up litter but instead "went down the stairs and hopped into an employee's van and helped the employee move the van."  Schmeling Dep. 17:8-22.  Schmeling testified that after moving the van, Napreljac went back up the steps and into the hotel.  According to Schmeling, the video did not show Napreljac walking down the steps at 8:30 a.m. but instead at 8:17 or 8:18 a.m.  Kaufman also testified Napreljac is not seen on the videotape on the east loading dock at 8:30 a.m.

Consolidating this testimony, JQH believes the video surveillance footage is inconsistent with Napreljac's recollection in three key respects.  First, JQH argues the video does not show Napreljac falling or slipping.  Second, JQH claims the tape does not show Napreljac on the east loading dock stairs at 8:30 a.m. picking up trash.  Third, JQH asserts the tape shows Napreljac "hopped" into a vehicle to park it, showing he was not injured.

Kaufman and Schmeling asked Napreljac whether he wished to see a physician, and Napreljac answered in the affirmative.  Thus, Napreljac was transported to Dr. Maurice Minervini's office for treatment.  When Napreljac returned from Dr. Minervini's office that afternoon, he met with Kaufman and Schmeling.  Before the meeting, Kaufman had determined Napreljac would be suspended pending the completion of her investigation.  Kaufman believed a suspension was appropriate because she "could not see on the tape where Mr. Napreljac was on the stairs at the time or when on the stairs [he] ever slipped, fell, winced."  Kaufman Dep. 59:13-18.  Further, Kaufman had not yet received word from Dr. Minervini regarding Napreljac's condition and wanted to review the physician's findings before making a decision.  Schmeling testified that when Napreljac became aware his conduct may have been videotaped, he "back-pedaled" and changed his story "[a] little bit from slipping and falling to stepping wrong and

14

then – it seemed from [Napreljac's statement that] 'I did not hurt myself today' that he was thinking it hurt from before." Schmeling Dep. 80:21-81:7. Kaufman suspended Napreljac and arranged a meeting with him on September 24, 2003.

By September 24, Kaufman had reviewed Dr. Minervini's notes from Napreljac's visit. Dr. Minervini indicates Napreljac said he "was walking down some steps and hurt [his] back," and that while he was "going down steps and picking up garbage with a stick, he stepped with R foot and felt extreme pain in R mid low back radiating to both legs." Def.'s App. 197; see also Def.'s App. 201. This description accurately reproduces what Napreljac recalls telling Dr. Minervini. Dr. Minervini believed Napreljac could return to work on September 19 – the day after the injury – if he lifted no more than five pounds, but no more than five times per hour, and pushed or pulled no more than five pounds of force. Dr. Minervini recommended Napreljac sit twenty-five percent of his day and that he see an orthopedic surgeon. He diagnosed Napreljac with a mild lumbar strain, with October 2, 2003, as the "anticipated date of maximum medical improvement." Def.'s App. 199-200.

After consolidating information from several sources, including Beaver's memo, Johnston's memo, the accident report, the video, and conversations with Johnston, Beaver, Postier, and Schmeling, Kaufman concluded Napreljac had been untruthful about how he had hurt himself on the stairs. She summarized her findings as follows:

> Q:   . . . . Was it your determination from your investigation that
>       [Napreljac] had not fallen on any stairs?
> A:   Correct.
> Q:   Was it your determination that he had not injured his back in any way
>       on September 18th of 2003?
> A:   That he had not been on the stairs where he had fallen, slipped,
>       winced, whatever.

> Q:   And so it was your determination that to the extent that he was
>       claiming that he had aggravated his previous back injury on September
>       18th of 2003 that was untrue?
> A:   Correct.
>   . . . .
> Q:   Was it your conclusion that he had not aggravated his back in any
>       way, then, on September 18th of 2003?
> A:   I concluded that he lied about going down the back dock steps and that
>       he had fell [sic] down, winced or misstepped in any manner.

Kaufman Dep. 115:20-116:16.  Kaufman specifically denied terminating Napreljac as a result of

an impending workers' compensation claim.

> Q:   And after Mr. Napreljac made a worker compensation injury report,
>       you terminated him?
> A:   . . . . I terminated him due to what information I had from the tape, the
>       doctor, the witnesses . . . .  I did not terminate him due to the fact that
>       he had a workmen's comp claim.  We already had that going for years.
>       I – he had been on restrictive duties or a claim pending on two differ-
>       ent ones before this for a long time.  And it never stopped us from
>       making sure that he was okay, making sure that he had something to
>       do and somewhere to go every single day . . . .
>   . . . .
> A:   . . . . I did not terminate him due to the fact that he made a workers'
>       compensation claim.  I terminated him on what information I had on
>       very numerous pieces put together.  And, again, he was already
>       pending with multiple workmen's comp against – it was here nor there
>       at the time.  I was already using restrictions – he already had restric-
>       tions against what he could do and for a long time.  And it never
>       stopped the hotel from making sure that he had a place to go every
>       day.  Did I terminate him due to filing a workmen's compensation?
>       No, I did not.

Kaufman Dep. 140:1-13; 141:3-16.

Napreljac was terminated on September 24, 2003.  Kaufman, Schmeling, and Mark

Leonetti, the assistant general manager, attended the termination meeting.  A notice of

termination completed by Schmeling and signed by Kaufman, contains the following explanation

for Napreljac's termination:

> Commission of any falsification or alteration of company records is just
> cause for immediate dismissal.  Employee signed accident report stating he
> was injured.  On 9-18-03 employee stated he injured himself while picking
> litter on the east side loading deck steps at approximately 8:30 a.m.  Investi-
> gation proves employee was not injured while picking up litter on said date
> of 9-18-03 on said time of 8:30 a.m.

Pl.'s App. 13.  An "X" appears on a blank next to "[v]iolation of company rules."  Pl.'s App 13.

According to Kaufman, firing Napreljac was appropriate because he "lied [about] reporting the

accident and signing the accident report," and thereby falsified the accident report.  Kaufman

Dep. 34:20-35:3; see also Kaufman Dep. 145:16-146:12 ("[H]e lied stating where he was, what

happened, what he had told [Beaver], what he stated in his accident [sic], and what he stated to

the doctor and what was seen on the tape.").  Napreljac understood why he was being

terminated, but when confronted with the notice of termination, refused to sign it.[5]

Napreljac contends his termination was a result of a "setup."  He alleges a false accident

report form was prepared for the sole purpose of later proving the contents of the report were

false.  He claims his version of events has been consistent all along.  For example, he points to

similarities between Dr. Minervini's notes prepared on September 18 and notes from a physician

---

[5] Schmeling confirms that Napreljac was terminated because the videotape did not show
he was injured in the way he claimed.  She elaborated:

> From my previous note of what was on the videotape, Mr. Napreljac had – during
> the accident investigation had told, again, one of his supervisors, someone that
> was in charge, that he had slipped and fallen.  He had told an accident investiga-
> tion team that he had slipped – or that he had slipped on the stairs.  He was
> walking down the steps, stepped wrong while he was picking up trash.  The
> videotape does not at any time show that the employee is picking up trash as he is
> going down the steps as one piece.  He was terminated also because he said he
> had told his supervisor, which was Scott Johnston, that he had injured himself,
> and through the investigation found out that he did not tell Scott Johnston that he
> was injured that morning.

Schmeling Dep. 67:16-68:8; accord Schmeling Dep. 54:13-22; 55:6-56:6.  Of course, the
relevance of this opinion is limited because Schmeling did not decide to terminate Napreljac.

he saw on September 29, 2003.  <u>Compare</u> Def.'s App. 197, 201 (noting Napreljac told Dr.

Minervini that "[he] was walking down some steps and hurt [his] back;" and that "while going

down steps and picking up garbage with a stick, he stepped with R foot and felt extreme pain in

R mid low back radiating to both legs"), <u>with</u> Def.'s App. 214 (noting Napreljac told a physician

on September 29, 2003, that "[p]atient . . . reports that his back was injured on 9/18/2003 8:30:00

AM. . . .  Patient states: '[I] was walking down some steps and hurt my back'").  Napreljac con-

trasts this consistency to JQH employees' depositions.  To give one example, he argues Postier

believed he slipped backwards and did not fall, and that Beaver testified Napreljac held a railing

when he slipped, a contention Schmeling and Postier deny.[6]

At bottom, Napreljac claims he was not terminated as a result of falsities in an injury

report but because of his disability, race, national origin, and because of a workers'

---

[6] Napreljac has retained Jacqueline Van Ahn, owner of a business known as "HR LINK," as a human resources expert who proclaims to be "knowledgeable as to appropriate protocol in conducting appropriate investigations and documentation of any and all disciplinary action [sic]."  Van Ahn has prepared a report detailing what she concludes are deficiencies in JQH's investigation leading to Napreljac's termination.

Van Ahn first criticizes Kaufman for making a "medical determination" regarding whether Napreljac suffered an injury.  The record shows Kaufman did not formulate a medical opinion; instead, she suspended and later terminated Napreljac based on what she perceived to be misrepresentations made by Napreljac during the course of her investigation regarding where he was and what he was doing at a particular time.  No speciality in medicine is needed to determine whether an individual slipped, fell, or stumbled.

Van Ahn further claims certain words in the accident report form were difficult for Napreljac to understand because he cannot speak English, and that the accident report form contains writings by at least two persons.  While a fact question exists regarding whether Napreljac can speak English, later discussion will show this factual dispute is not material.

Finally, Van Ahn critiques Kaufman's investigation methods, claiming Kaufman should have documented certain aspects of her investigation, including the reason for Napreljac's suspension.  The record shows why Napreljac was suspended and demonstrates the methods used by Kaufman in her investigation.  Merely because Van Ahn would have conducted the investigation differently does not, in the absence of underlying factual disputes, create a genuine issue of material fact that Napreljac was terminated for an improper reason.

compensation claim that could have resulted from his September 18 injury.  However, when

Napreljac was asked to recall comments he heard or actions to which he was subjected

suggesting discrimination based on his national origin, he testified as follows:

> Q:    Did anybody who was one of your supervisors or managers at the
>        hotel ever say anything to you about your being from Bosnia or about
>        your race that offended you?
> A:    No one said that to me.  We were all okay while I was doing the job.

Pl.'s Dep. 84:16-22, Feb. 8, 2006.  When given the chance to explain why he believed he was

terminated as a result of his national origin, Napreljac refused to answer.

> Q:    . . . Do you believe the hotel fired you because of your national origin?
> A:    Can I not answer that question?
> Q:    Why don't you want to answer that question
> A:    Just because.

Pl.'s Dep. 91:9-14, Feb. 8, 2006.  When interrogated about his disability discrimination claim,

the following exchange occurred:

> A:    [W]hile I was working with them and while I was able to perform all
>        of the job duties, I was good with them and they were good with me.
>        But when, after I got injured and I could no longer work, they looked
>        for reasons to get rid of me.
> . . . .
> Q:    Do you believe the hotel fired you because of an alleged disability that
>        you have, that you had at the time?
> A:    I believe that to be 80 percent true.
> Q:    Do you believe that it's 80 percent the case that the hotel fired you
>        because of an alleged disability?
> A:    Yes, I do believe that.
> Q:    What do you believe to be the other 20 percent of the reason for your
>        having been fired?
> A:    I don't know.  I don't know.

Pl.'s Dep. 83:21-84:2; 91:15-92:2, Feb. 8, 2006.

With respect to Napreljac's claim that he was terminated in retaliation for a potential

workers' compensation claim, he testified as follows:

> Q:   Do you believe that one of the reasons you were fired in connection
>      with your hotel employment related to your having made any sort of
>      legal claim relating to a workplace injury?
>
> A:   I [do].[7]
>
> . . . .
>
> Q:   Do you believe that the fact that you wanted to have treatment for your
>      previous worker compensation injury when you hurt your back had
>      anything to do with your being fired?
>
> . . . .
>
> A:   Yes, it did, because they were supposed to provide me with the doctor
>      and provide me with treatment.  And instead of treatment, I got fired.
>
> . . . .
>
> Q:   Did they ever offer to allow you to continue to work with the restric-
>      tions that the physician placed on your condition as of September 18
>      of 2003?
>
> A:   They did not allow me to go back.  They suspended me immediately
>      and gave me a slip of paper, just a plain piece of paper, that says I was
>      suspended without any signature on it and without any
>      explanations. . . .

Pl.'s Dep. 133:5-10; 142:22-143:9; 147:19-148:4, Feb. 8, 2006.

JQH argues Napreljac was not terminated for an unlawful reason but was fired because

he made false statements as part of an investigation into a workplace injury.

**C.    Napreljac's Physical Capabilities Circa September 18, 2003.**

Because the parties contest whether Napreljac suffered from a disability at the time of his

termination, his physical abilities around the time of his termination are relevant.  Since his

termination, Napreljac has occasionally denied he was injured at all.  When confronted with Dr.

Minervini's report prepared after his September 18 visit, he testified as follows:

> Q:   Did you tell Dr. Minervini on September 18, 2003, quote, I was
>      walking down some steps and hurt my back, end of quote?
>
> A:   I could not have said that, because I did not injure my back.  I maybe, I
>      could have said that my back was feeling worse, and this document is
>      not truthful and is only helping those against me.

---

[7] Napreljac's initial answer read, "I do not," but he corrected this answer in an errata
sheet.  See Pl.'s Dep. 155, Feb. 8, 2006.

Pl.'s Dep. 88:6-15, Feb. 8, 2006.  Napreljac contends both Dr. Minervini and JQH employees

must have misunderstood him.

> Q:   Well, is it possible, sir, that you also told one or more of your super-
> visors at the hotel something very similar to, quote, I was walking
> down some steps and hurt my back, end of quote?
>
> A:   I said that in the same context I told the doctor, not that I was injured,
> but that I was feeling worse.
>
> Q:   Is it your claim that the doctor misunderstood you or that she is
> misrepresenting what you told her?
>
> A:   She probably misunderstood.
>
> Q:   And is it also your view that your supervisors at the hotel may have
> misunderstood what you said?
>
> A:   Maybe.

Pl.'s Dep. 88:25-89:16, Feb. 8, 2006.  At a deposition taken in connection with another pro-

ceeding, Napreljac testified as follows:

> Q:   What injury date was reported, if you know?
>
> A:   Do you mean the false one?
>
> Q:   Yes.
>
> A:   I believe it was September 18th or 19th, 2003.
>
> Q:   Do you know the details of the alleged false injury report?
>
> A:   I don't.
>
> Q:   Do you know what part of your body was said to be hurt?
>
> A:   Back.
>
> Q:   Your low back?
>
> A:   Low back.
>
> Q:   Did you sustain a low back injury on September 18th or 19th of 2003?
>
> A:   No, I didn't.  I just felt worse since I already worked
> under restrictions.
>
> . . . .
>
> Q:   And how did you find out, then, that Embassy Suites or somebody at
> the Embassy Suites was reporting a third injury?
>
> A:   I know because I was present.  I was – I was there when they were
> trying to actually report the injury that didn't happen.  All the people
> there were general manager, there was a manager of housekeeping
> there, and the representative from human resources, and they were
> trying to report the injury, and I was opposing because I – I said it
> wasn't an injury, and I didn't want it reported.

Pl.'s Dep. 71:2-19; 72:6-17, Feb. 23, 2005.  Other portions of his testimony suggest he was not

injured anew, but aggravated a previous injury.

> Q:   And it was your position that you had not sustained an injury on
>       September 18 of 2002 [sic]?
> A:   I didn't – I wasn't injured.  I just felt worse.
> . . . .
> Q:   . . . . I was listening when you were talking . . . about September 18,
>       2003, and my understanding was that you [said] there was not any
>       incident, event, activity, whatever phrase you would like to use, that
>       happened on that day that caused you injury.
> A:   That day, I just felt worse.

Pl.'s Dep. 73:19-25; 106:15-21, Feb. 23, 2005; see also Pl.'s Dep. 142:1-6; 146:16-25, Feb. 8,

2006; Pl.'s Dep. 61:22-25, Jan. 17, 2005 (listing Napreljac's November 2001 and August 2003

injuries as a compete catalog of workplace injuries); Pl.'s Supp. App. 76 (containing a letter

from Dr. Minervini indicating Napreljac "occurred an aggravation of a preexisting back

problem" on September 18); Pl.'s Second Supp. App. 130 (containing a letter from JQH's

workers' compensation insurance carrier concluding "that there was no evidence of a new work

related injury on September 18, 2003").  Napreljac explained how he felt "worse" as follows:

> Q:   . . . And during the day you didn't get to feel any better?
> A:   I felt worse.
> Q:   Okay.  But the change in your condition, do you point to anything that
>       you were doing to say that made you feel worse?
> A:   Can't say exactly.  Maybe a wrong step or something.
> Q:   Okay.  A wrong step doing what?
> A:   As I was walking around picking up trash.  It's not the – it's not the
>       even surface.
> Q:   Okay.  Did you fall?
> A:   No.
> Q:   Did you stumble?
> A:   No.
> Q:   Just while you were walking around, you didn't feel good?
> A:   I did no – I did not because I was already feeling bad.

Pl.'s Dep. 107:9-108:2, Feb. 23, 2005.

Still other portions of the record indicate Napreljac's September 2003 injury was a new

injury.  See Iowa Civil Rights Comm'n Compl. ¶ 14; see also Def.'s App. 208 (listing the

September 2003 injury as a separate injury); Pl.'s App. 26 (same).

Representations from Napreljac's treating physicians are scattered regarding his physical

abilities.  For example, a letter from a physician drafted October 23, 2003, indicates Napreljac

suffered significant pain.  However, a November 24, 2003, letter suggests that if a pending MRI

did not show changes from an MRI taken in 2000, his treating physician would conclude

Napreljac "had only a temporary aggravation, and [he] would not anticipate any permanent type

of disability rating."  Pl.'s App. 36.  An April 7, 2004, letter indicates Napreljac was "released . .

. back to regular duty effective February 19, 2004," because "he reached his maximum medical

improvement at that point in time, and [his treating physician did] not feel he sustained any

permanent impairment."  Pl.'s App. 37.

A December 21, 2004, letter indicates Napreljac was told to seek treatment by his attor-

neys as a result of complaints of increased back pain.  The letter references Napreljac's February

2004 visit, noting Napreljac then had "multiple levels of degenerative disc disease," but with a

finding of a lack of neural entrapment.  The physician wrote he was unsure why Napreljac

sought treatment or "what the intent of his attorney was for sending him," and that the only help

he could offer was anti-inflammatory medication and directions to continue at-home exercises.

Pl.'s App. 39.  At his January 2005 deposition, Napreljac testified that he experienced neck and

back pain.  In February 2005, he recalled a recent visit to a physician who purportedly cautioned

Napreljac against bending and lifting.

On April 12, 2005, Napreljac's attorneys referred him to a physical therapist for a

functional capacity evaluation.  Notes prepared thereafter conclude he was capable of working at

23

a light physical demand level for an eight-hour day.  A June 2005 letter indicates no need for continued medical treatment for Napreljac's neck or back conditions but reflects Napreljac's "physical capabilities [are] of light physical demand."  Pl.'s App. 42.

Physicians attempting to pinpoint Napreljac's functional capacity have reportedly faced difficulty because Napreljac has not put forth full efforts to reach joint treatment goals.  For example, in June 2002, a physician noted Napreljac "clearly has some non-physiologic factors suggesting symptom magnification or malingering that are contributing to his difficulties." Def.'s App. 217.  August 2002 treatment notes indicated a "submaximal effort" and that some functional tests were "invalid because of poor effort."  Pl.'s App. 32; see also Pl.'s App. 34 (citing "lack of effort" for invalid results in two tests).  Likewise, in October 2003, a physical therapist wrote, "I feel that his condition is slowly improving, but I feel that subjective and objective measurements do not agree.  He performs all ex's without any problems, yet his subjective c/o do not change."  Def.'s App. 218.  In response, Napreljac claims to have tried his best.[8]

Aside from records and letters created by medical professionals, other evidence sheds light on Napreljac's physical abilities.  In 2002, Napreljac purchased and remodeled a home. Napreljac testified he hired others to perform the bulk of the work for him and performed no work that would have violated restrictions imposed upon him while he was at JQH.  While Sadifa Napreljac, Plaintiff's wife, recalled that he put siding on the house and helped build its front porch, she testified that those Napreljac hired performed most of the work.

_____

[8] Napreljac complains JQH has withheld a document which "essentially gives the Plaintiff permanent work restrictions."  Napreljac has not filed a motion to compel, and he has not pointed to a place in the record to support his belief regarding what the document contains.

In addition to helping his wife operate a grocery store, Napreljac also performed construction work on the home where he now lives.  While working on this house, Napreljac "tried doing what he [could]" and "[didn't] understand that there are things he cannot do."  Sadifa Napreljac Dep. 45:10-16; see also Pl.'s Dep. 49:10-11, Feb. 8, 2006 (containing Napreljac's confession that he did "[a]s much as [he] could on the whole house").  Napreljac helped pour concrete for the home's driveway and did around sixty percent of the masonry work.  He installed stone on the outside of the house and, with help, installed stones around the home's three fireplaces.  With the aid of a machine, he mixed mortar for the fireplaces but manually carried mortar to the location it was needed.

For around nine months after his termination from JQH, Napreljac worked at another Des Moines hotel known as the 14th Street Inn.  He was hired as a maintenance worker, but his role was supervisory in nature.  Still, he attempted to help those he supervised as much as possible.  Napreljac's duties there were more physically demanding than his job at JQH.  For example, Napreljac testified that as part of a remodeling project, he replaced drywall and painted.  He did not lift or carry furniture because he was not capable of that task.

At the time of his February 2006 deposition, Napreljac worked for a company located in the Des Moines area which delivered boxes of medications to pharmacies.  Napreljac testified this job required him to lift boxes, but he was not able to estimate their weight.  As of February 2006, Napreljac had no medical restrictions limiting his ability to lift, but he attributes that to his lack of medical insurance, prognosticating that if he returned to a physician, he would receive restrictions.

### D.    Napreljac's Command of the English Language.

There is considerable debate in the record regarding Napreljac's ability to communicate in English.  This disagreement is arguably relevant to Napreljac's claims that he was terminated as a result of his national origin.

Bosnian – not English – is Napreljac's native language.  However, JQH employees have consistently maintained that Napreljac has a reasonable command of the English language.  Schmeling, for example, testified that Napreljac "had a very good command of the English language," "could understand English," and was able to communicate effectively with JQH employees as part of the investigation leading to his termination.  Schmeling Dep. 70:8-21.  Beaver testified Napreljac "had a good understanding of the English language."  Beaver Dep. 54:5-55:6.  Other employees generally supported these views.  E.g., Johnston Dep. 56:12-57:2; Def.'s App. 289 (containing a "New Employee Progress Report" indicating Napreljac "has excellent English skills"); Unemployment Ins. Appeals Bureau Hr'g Tr. 27:14-19 (containing testimony from an unidentified JQH representative who "[was] not sure of the limit of his vocabulary[; b]ut as far as simple sentences and structure and understanding employee docu-ments, yes," he could understand English).  Additionally, a transcription prepared by a physician following Napreljac's 2001 injury reveals his treating physician's opinion that he had "a good command of the English language and there did not seem to be any real difficulties in under-standing and communicating."  Def.'s App. 184.

Napreljac's personal assessment of his abilities is more limited.  He declares he "ha[s] trouble understanding legal concepts in English."  Napreljac Aff. ¶ 4, June 15, 2006.  He claims that some words used in the accident report precipitating his termination were "confusing because of [his] limited abilities to communicate in English."  Id. ¶ 8.  He also points to an errata

sheet completed following a deposition where he indicated he did not fully understand a question posed.[9]

Napreljac testified he often requires an interpreter because he does not speak English well enough to communicate effectively. The record shows Napreljac required an interpreter to secure a bank loan but not to converse with potential employers about employment opportunities. Napreljac speaks English at his delivery job and spoke English while employed at the 14th Street Inn, and no interpreter was supplied at either job. JQH notes Napreljac denied needing an interpreter while at JQH, and that he actually spoke English well enough to serve as an interpreter for other Bosnian-speaking employees. Napreljac was able to read portions of employment application materials and a medical record written in English at his deposition. JQH further claims Napreljac spoke with newspaper reporters writing a story about one of his homes without an interpreter present. The resulting article extensively quoted Napreljac speaking in English. See Def.'s App. 287-288.

Napreljac's ability to speak English is thus an issue of considerable debate.

## III.    Procedural History of This Litigation.

On March 22, 2004, Napreljac filed complaints with the Iowa Civil Rights Commission (ICRC) and the Equal Employment Opportunity Commission (EEOC), alleging discrimination

---

[9] An "expert report" prepared by an interpreter, Azra Sikiric, concludes Napreljac did not adequately understand what JQH employees were communicating to him at the time of his termination. Pl.'s Supp. App. 125. This report is largely conclusory. For example, Sikiric does not set forth the factual bases or methodologies or procedures used to support the conclusions reached. See Pl.'s Supp. App. 125. While Sikiric served as a translator during a deposition, indicating some expertise translating Bosnian to English, and vice versa, that expertise does not necessarily extend to support an opinion regarding Napreljac's ability to understand communications Sikiric did not witness.

based on disability, race, and national origin.  Napreljac filed this action in the Iowa district court on December 8, 2004, which JQH removed to this Court on March 21, 2005.

Napreljac does not separate his allegations into counts, but his claims are easily collected into four topics.  But see Fed. R. Civ. P. 10(b) ("Each claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth.").  He first claims JQH discriminated against him on the basis of a disability, in violation of the Americans with Disabilities Act (ADA) and the Iowa Civil Rights Act (ICRA).  Second, he alleges JQH discriminated against him on the basis of his race and national origin.  Third, Napreljac alleges he was discharged in violation of public policy because he was terminated as a result of past and future workers' compensation claims.  Fourth, he accuses JQH of committing the tort of intentional infliction of emotional distress.[10]

Each side has pending motions.  Beginning with Napreljac's, he claims entitlement to summary judgment on his disability discrimination and discharge in violation of public policy claims.  In addition to seeking dismissal of Napreljac's action in its entirety for alleged discovery abuses, JQH claims entitlement to summary judgment on each of Napreljac's causes of action.

---

[10] Plaintiff's original Petition at Law includes paragraph 11(g), claiming a cause of action "[i]n such other ways as will be shown by the evidence and supported by legal remedies." Because this statement does not state a claim upon which relief could be granted, it is not considered in the following discussion.

**DISCUSSION**

I.      **JQH's Motion to Dismiss.**[11]

JQH first moves to dismiss Napreljac's action in its entirety, asserting the existence of a pattern of deceit in papers produced and testimony presented by Napreljac, coupled with a pervasive "foot-dragging" strategy employed by Napreljac in disclosing information ultimately proven to be harmful to his position.  Dismissal is urged because Napreljac's conduct allegedly amounts to an "abuse of the judicial process."  JQH has presented no intermediate remedy between denying its motion and dismissing Napreljac's case.

Resisting, Napreljac agrees that "mistakes" have occurred in certain answers to discovery requests propounded by JQH but claims to have diligently supplemented responses and answered truthfully when deposed about sectors of the record JQH alleges contain false statements.

A.      **Legal Standards for Sanctions for "Abuse of the Judicial Process."**

JQH seeks dismissal of Napreljac's action as an exercise of the Court's inherent powers. The United States Supreme Court, commenting on the scope of inherent powers vested in federal courts, has noted that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion."  Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991); see also Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1979) ("Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion.").  "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process."  Chambers, 501 U.S. at 44-45; accord Stevenson v. Union P. R.R. Co., 354 F.3d 739, 745 (8th Cir. 2004); Keefer v. Provident Life & Accident Ins. Co., 238 F.3d

---

[11] Although JQH's motion is styled as a Motion to Dismiss, it is technically a motion for sanctions with dismissal as the suggested remedy.

937, 941 (8th Cir. 2000).  As a result, the scope of sanctions is a matter typically committed to

the discretion of district courts.  Stevenson, 354 F.3d at 745-46; Martin v. DaimlerChrysler

Corp., 251 F.3d 691, 694 (8th Cir. 2001); Keefer, 238 F.3d at 940-41; Dillon v. Nissan Motor

Co., 986 F.2d 263, 268 (8th Cir. 1993).  Assessing attorneys fees, Gas Aggregation Servs., Inc.

v. Howard Avista Energy, LLC, 458 F.3d 733, 739 (8th Cir. 2006); Chambers, 501 U.S. at 45;

Stevenson, 354 F.3d at 751; Kelly v. Golden, 352 F.3d 344, 352 (8th Cir. 2003), and imposing

adverse inference jury instructions at trial, Stevenson, 354 F.3d at 746-50, are available remedies

against a party abusing the judicial process.  Dismissal of an action, a "particularly severe,"

Chambers, 501 U.S. at 45 (discussing Roadway Express, 447 U.S. at 765), or "harsh" sanction,

Keefer, 238 F.3d at 941, may be appropriate only after careful scrutiny of the record and a

demonstration of truly "dilatory and contumacious conduct," Keefer, 238 F.3d at 941, "because

'"the opportunity to be heard is a litigant's most precious right and should be sparingly

denied,"'" Keefer, 238 F.3d at 940-41 (quoting Chrysler Corp. v. Carey, 186 F.3d 1016, 1020

(8th Cir. 1999), in turn quoting Edgar v. Slaughter, 548 F.2d 770, 773 (8th Cir. 1977)); accord

Martin, 251 F.3d at 694.  See generally Lindstedt v. City of Granby, 238 F.3d 933, 937 (8th Cir.

2000) (collecting cases placing dismissal of an action within a court's discretion).[12]  Exercising

caution before euthanizing plaintiffs' causes of action has grown from an essential and strong

policy of deciding cases on their merits and against depriving individuals of an opportunity to

present evidence in court.  Carey, 186 F.3d at 1022 (citing Baker v. Gen. Motors Corp., 86 F.3d

811, 817 (8th Cir. 1996), rev'd on other grounds, 522 U.S. 222 (1998)).

---

[12] Although the dismissal in Lindstedt was primarily precipitated by Federal Rule of Civil Procedure 37 and Local Rule 37.1 of the Western District of Missouri, see Lindstedt, 238 F.3d at 936-37, our circuit has since cited Lindstedt for the principle that dismissal is a remedy created by the court's inherent powers, Keefer, 238 F.3d at 941.

Occasionally, however, a party's conduct is so egregious as to warrant extinguishing that opportunity.  See Keefer, 238 F.3d at 941 (dismissal appropriate when plaintiff willfully destroyed evidence undermining his credibility in the face of an oral court order and multiple discovery requests compelling its disclosure); Carey, 186 F.3d at 1020-22 (striking defendants' pleadings, placing defendants in default, where "defendants repeatedly lied during the discovery process [by] denying the existence of conversations and documents which had in fact occurred and did exist," and thus "seriously threatened the integrity of the trial as well as the judicial process in general"); Pope v. Fed. Express Corp., 974 F.2d 982, 984 (8th Cir. 1992) (affirming dismissal upon a finding that "manufactured evidence and perjured testimony had been intro-duced in an attempt to enhance the [plaintiff's] case through fraudulent conduct"); cf. Lawrence v. Bowersox, 297 F.3d 727, 733-34 & n.2 (8th Cir. 2002) (noting the "generous" decision of a district court which imposed attorneys' fees and costs instead of striking the defendants' pleadings after defendants failed to provide a list of officials involved in alleged civil rights violations of prisoners and failed to produce (and later lost) a videotape of the incident giving rise to litigation).[13]

---

[13] Although the Supreme Court has written that a specific finding of bad faith "would have to precede any sanction under the court's inherent powers," Roadway Express, 447 U.S. at 767, that language has been restricted by our circuit to apply only in cases where attorneys' fees are awarded as a sanction against a party or its counsel, see Harlan v. Lewis, 982 F.2d 1255, 1260 (8th Cir. 1993).  Our circuit cabined the import of Roadway Express by noting that extending a bad faith "requirement to every possible disciplinary exercise of the court's inherent power . . . would apply the requirements to even the most routine exercises of the inherent power," including the power to impose silence, respect, and decorum.  Harlan, 982 F.2d at 1260 (citing Anderson v. Dunn, 19 U.S. (6 Wheat.) 529 (1821)).  The court concluded no bad faith finding was necessary to impose monetary sanctions.  See id.  Similar logic mandates a similar conclusion here.

### B.   Discussion.

Relying principally upon <u>Martin v. DaimlerChrysler Corp.</u>, JQH claims Napreljac's con-

duct warrants dismissal.  In <u>Martin</u>, the Eighth Circuit upheld the sanction of dismissal after the

plaintiff engaged in "severe discovery abuses."  <u>Martin</u>, 251 F.3d at 692.  There, the plaintiff

brought a Title VII action in federal court in Missouri "alleging hostile work environment sexual

harassment, sex discrimination, and retaliation."  <u>Id.</u> at 692-93.  During discovery, the defendant

took the plaintiff's deposition and served her with interrogatories.  <u>Id.</u> at 693.  At her deposition,

the plaintiff "twice testified that she had never been a party to another lawsuit, specifically

denying that she had been involved in any litigation" against employers preceding the defendant.

<u>Id.</u>  The defendant subsequently learned the plaintiff had sued her former employer in two

separate actions in Oklahoma "for sexual harassment, discrimination, and wrongful termination."

<u>Id.</u>  The defendant discovered the plaintiff "had retained several different attorneys to represent

her" in her previous actions, "and appeared in person at a case management conference" in one

such action.  <u>Id.</u>

The defendant's interrogatories required the plaintiff to identify mental health profes-

sionals providing treatment for mental distress or other harm alleged caused by the defendant.

<u>Id.</u>  The plaintiff listed some providers in Saint Louis, Missouri.  <u>Id.</u>  The plaintiff later

confirmed the list was an exhaustive collection of providers who had ever provided treatment for

emotional distress and other mental problems.  <u>Id.</u>  The defendant then learned the plaintiff had

received counseling and other treatment by mental health care providers in Oklahoma in

connection with divorce and child custody proceedings.  <u>Id.</u>

Based on these "false discovery responses," the defendant filed a motion for sanctions,

seeking to dismiss the plaintiff's complaint.  <u>Id.</u>  At oral argument, the plaintiff "admitted she

had spoken to one of her Oklahoma attorneys, but had foggy or no recollections of the other two [attorneys], and of her appearance at the case management conference," id. at 693-94, and "repeatedly claimed she had no knowledge of or involvement in the Oklahoma lawsuits." Id. at 694. As a result of these discovery abuses, the district court dismissed the plaintiff's claims with prejudice. Id. Finding evidence that the plaintiff "gave perjurious answers during her deposition and in her interrogatory responses" and concluding the plaintiff's "argument that she failed to understand that she was required to disclose [health care providers] who examined her in the course of her divorce proceedings [was] entirely without merit," the Eighth Circuit affirmed. Id. at 694-95. JQH argues that because Napreljac's conduct is analogous, the conclusion should be the same.

The "pattern of deceit" JQH claims to have unearthed is divisible into three topics: concealment of Napreljac's criminal history, which, JQH argues, "bears on his emotional and mental condition, as well as JQH's defense of after-acquired evidence"; concealment of Napreljac's "past problems with depression"; and "lie[s] about his work history."[14]

Beginning with Napreljac's criminal history, JQH argues "Napreljac swore in his interrogatory responses that he had no arrests or convictions," when in fact he had been "arrested and convicted multiple times." This involves an interrogatory from JQH that inquired whether "Plaintiff [has] ever been arrested or convicted of any crime(s) since January 1, 1995, to the present"; Napreljac answered "[n]o." Pl.'s Resp. to Def.'s Interrog. # 8. This answer is untrue. Since January 1995, Napreljac has been convicted at least three times of operating while intoxi-

---

[14] JQH also seeks dismissal because of what it claims are inconsistencies related to Napreljac's ability to speak English. It is sufficient to note no alleged procedural abuse trestles JQH's argument. JQH instead rests on witnesses' impressions of Napreljac's command of the English language.

cated and has been arrested for harassment and domestic assault.  See Def.'s Supp. App. 1-10.

JQH points to the following exchange at Napreljac's deposition as evidence he has not been

forthcoming regarding his criminal history:

> Q:   Other than the two times you've been arrested for drunk driving in the
>      State of Iowa, have you been arrested for anything else?
> A:   I was not.
> Q:   So the answer is you've never been arrested for anything other than
>      the two drunk driving arrests you've just mentioned, correct?
> A:   Correct.
> . . . .
> Q:   Sir, do you recall having been convicted of a third drunk
>      driving situation?
> A:   I remember, yes.

Pl.'s Dep. 123:18-124:2; 126:11-14, Feb. 8, 2006.  Napreljac also agreed with the position that

"there might be more arrests out there, [he] just can't remember what they were."  Pl.'s Dep.

128:7-11, Feb. 8, 2006.  He later recalled his harassment and domestic assault arrests.

In his resistance, Napreljac concedes he answered JQH's interrogatory incorrectly.

However, he contends he "did not maintain his denial in a manner that could be described as a

pattern of abuse or continual misrepresentation."  For example, he notes he admitted prior arrests

and convictions at his deposition and provided JQH with supplemental discovery responses,

including his criminal history drawn from an online database.[15]  Napreljac has also signed a

---

[15] Napreljac expends significant energy arguing that failing to disclose his criminal record
was appropriate because JQH's request for that information was not reasonably calculated to
lead to admissible evidence.  However, instead of objecting to JQH's interrogatory, Napreljac
denied the existence of the material the interrogatory sought.  See Fed. R. Civ. P. 33(b)(1)
("Each interrogatory shall be answered separately and fully in writing under oath, unless it is
objected to, in which event the objecting party shall state the reasons for the objection and shall
answer to the extent the interrogatory is not objectionable.").  There is a material difference
between the two positions.

Additionally, this argument was rejected by Magistrate Judge Celeste Bremer in connec-
tion with a motion to compel filed by JQH earlier in these proceedings.  See Napreljac v. John Q.
Hammons Hotels, Inc., Civ. No. 4:05-cv-00160, slip op. at 1 (June 8, 2006); see also Pl.'s Br. in

release permitting JQH to obtain any of his records maintained at the Iowa Department of

Corrections.  At his deposition he explained the deficiencies to his interrogatory responses

as follows:

> Q:   Sir, why didn't you tell us about the arrests or convictions that we've
>       just been discussing in response to [interrogatory number eight]?
> A:   Because at the time I was answering these questions my children were
>       translating this to me, and they don't understand the law so they didn't
>       know whether that was a crime or not.

Pl.'s Dep. 131:15-24, Feb. 8, 2006.  This explanation is consistent with other portions of his

deposition.  See, e.g., Pl.'s Dep. 101:12-20, Feb. 8, 2006.

Second, JQH claims Napreljac concealed information about past mental health problems

in an effort to maximize damages arising from his intentional infliction of emotional distress

claim.  JQH argues that while Napreljac disclosed the identities of those who treated him for

physical injuries sustained while working at JQH, he failed to identify professionals provided

treating bearing on his emotional and mental health.  Specifically, JQH argues Napreljac failed

to disclose treatment he received from a Dr. Majed W. Barazanji, who performed a physical on

Napreljac in September 2005.  Compare Pl.'s Resp. to Def.'s Interrog. # 11 (omitting Dr.

Barazanji from an interrogatory answer requiring Napreljac to disclose any "doctor, psychiatrist,

psychologist, therapist, general health practitioner, and/or any other medical professional"

Napreljac "visited or received care and/or treatment from" between January 1, 1995, and the

present), with Def.'s App. 248-249 (containing notes from Dr. Barazanji dated September

13, 2005).

---

Supp. of Pl's Resistance to Mot. to Compel 3-10; Reply in Supp. of Def.'s Mot. to Compel 2-6.
After considering Napreljac's position, Magistrate Judge Bremer ordered Napreljac to execute a
release of information to the Iowa Department of Corrections related to his criminal history.
Finally, Napreljac's criminal history was fully discussed at his deposition (without objection).

JQH contends this omission is material because Dr. Barazanji opined that Napreljac "denie[d] any depression or anxiety" and was in a "[h]appy mood."  Def.'s App. 248.  JQH contrasts these observations with notes prepared by Dr. Craig Rypma, a psychologist treating Napreljac in November 2005 who indicated a significant amount of emotional distress, psychological pain, and symptoms of depression.  Dr. Rypma's notes indicate Napreljac denied being previously treated for depression.[16]  Compare Def.'s App. 251, 254 (notes prepared by Dr. Rypma indicating Napreljac was "depressed" and "experiencing severe psychopathology, fears of persecution, depression, and anxiety which, based on verbal reports, were not present prior to termination from Embassy Suites"), with Def.'s App. 256 (medical survey completed by Napreljac dated February 2003 indicating "[p]roblems with depression" and "[m]edication for depression"), Def.'s App. 259 (medical record dated March 5, 2003, indicating Napreljac suffered from "depression" and a "nervous breakdown"), and Def.'s App. 260 (medical survey indicating "[d]epressive feelings").[17]

Napreljac claims he truthfully responded to JQH's interrogatories by pointing to his disclosure of treatment received at Eyerly Ball, a mental health facility.  Napreljac specifically disclosed seeking treatment at Eyerly Ball in January 2005 for depression caused by emotional

---

[16] JQH argues Napreljac "deceived" Dr. Rypma by claiming he had not had psychological difficulties prior to his employment with JQH.  If Dr. Rypma was deceived, that deception did not abuse the judicial process because Dr. Rypma is not a party, Napreljac was not under oath or otherwise compelled to be truthful to Dr. Rypma, and JQH has traced no prejudice originating from any alleged deceit.  Consequently, Napreljac's comments to Dr. Rypma cannot form the basis of a motion for sanctions.

[17] Although the survey located at JQH Appendix page 260 is undated, it is relatively simple to approximate a date of its creation.  The document lists Napreljac's age as 42; the previous page in JQH's Appendix is a similar survey dated March 2003, when Napreljac was 43. Compare Def.'s App. 259, with Def.'s App. 260.

distress spawning from his termination.  Napreljac further produced in supplemental responses medical records relevant to his emotional distress claim.  Finally, he provided a records waiver allowing JQH to obtain all relevant psychological records, and the record shows JQH has obtained those records.

With respect to the medical surveys indicating Napreljac had been treated for mental problems, Napreljac notes these documents do not conclusively prove he received treatment for depression, and if they do, Napreljac claims the forms were completed erroneously.  Napreljac notes Dr. Barazanji is a family practice doctor – not a mental health professional – who made the notes referenced above during a physical.

Third, JQH alleges Napreljac failed to fully disclose elements of his work history.  In particular, JQH contends Napreljac did not admit his employment at a business called Monarch Manufacturing.  The record shows JQH is correct.  In an interrogatory answer responding to a call for Napreljac's work history, no period of employment at Monarch Manufacturing is present.  Napreljac admitted at his deposition that he worked for that company for about a month.  JQH argues Napreljac intentionally omitted his employment there because his wife, a former Monarch Manufacturing employee, "sued that employer in a complaint that is a virtual carbon copy of Napreljac's allegations."  See Def.'s App. 261-264.  JQH notes that fewer than three months after Napreljac's wife dismissed her action against Monarch Manufacturing, Napreljac initiated this litigation.

Napreljac does not deny failing to include in his interrogatory responses his employment at Monarch Manufacturing.  To explain the inconsistency between his interrogatory responses and his deposition, Napreljac notes he worked at Monarch Manufacturing for less than one month and contests it is "entirely possible [he] simply forgot about this brief period of employ-

ment during the course of discovery."  Further, Napreljac points out that after he realized his omission, he provided a supplemental response listing Monarch Manufacturing as a previous employer.

Analyzing the trio of subjects raised by JQH reveals clear inconsistencies in Napreljac's responses to interrogatories, his deposition, and documents he has produced.  But the record also shows Napreljac has disclosed information when asked and has timely provided supplemental materials when new information has come to light or has been recalled.  If the Court dismissed Napreljac's case, that conclusion could have the practical effect of penalizing diligent supple-mentation of discovery materials as the Federal Rules of Civil Procedure require.  See Fed. R. Civ. P. 26(e)(2) (placing upon parties the duty to "seasonably . . . amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing").  Additionally, JQH has pointed to no prejudice germinating from Napreljac's conduct during discovery.

While JQH is certainly justified in suspecting Napreljac has not been entirely truthful as this case has proceeded, JQH has not shown Napreljac's conduct rises to the truly extreme level required to dismiss his case.  For example, JQH has not proven Napreljac has submitted falsified documents, see Pope, 974 F.2d at 984; deliberately destroyed relevant evidence, see Keefer, 238 F.3d at 941; made and maintained material misrepresentations at a hearing or deposition, see Martin, 251 F.3d at 693-95; or steadfastly denied the existence of evidence resulting in prejudice to his opponent, see Carey, 186 F.3d at 1020-22.  Because JQH does not suggest a lesser sanction or seek alternative relief, this ends the analysis.  See Keefer, 238 F.3d at 941

38

(cautioning that "fairness requires a court to consider whether a lesser sanction is available or appropriate" before imposing the sanction of dismissal).

### C.    Conclusion.

To be clear, committing perjury at a deposition or in discovery responses or deliberately withholding material information is intolerable conduct.  Napreljac himself recognizes that "[t]he possibility of lost credibility will be sufficient deterrent to this Plaintiff in any future actions." This self-inflicted admonishment indicates Napreljac himself realizes the severe consequences of engaging in what our circuit has termed "playing 'hide the ball'" during discovery.  Lawrence, 297 F.3d at 734.  Napreljac's decision to supplement responses to discovery requests by JQH coupled with eventual cooperation and truthfulness at his deposition distinguishes this case from those where dismissal is appropriate.

JQH's Motion to Dismiss therefore must be denied.[18]

## II.    Cross Motions for Summary Judgment.

The analysis turns to the parties' Motions for Summary Judgment.  As noted above, JQH has moved for summary judgment on each of Napreljac's claims.  Napreljac has moved for summary judgment on his disability discrimination and discharge in violation of public policy claims.[19]

---

[18] Napreljac's discussion of JQH's own "pattern of deceit" is not relevant because he has not moved for sanctions.

[19] Napreljac also seeks summary judgment on JQH's after-acquired-evidence affirmative defense, but for reasons discussed below, consideration of this argument is unnecessary.

### A.    Standards for Summary Judgment.

Federal Rule of Civil Procedure 56 permits claimants and parties against whom claims are brought to move for summary judgment.  Fed. R. Civ. P. 56(a), (b).  The standard is the same under either scenario:  "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Id. R. 56(c).  The task performed "is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

As Rule 56(c) requires, the Court must examine the record to determine if it contains genuine issues of material fact.  See Fed. R. Civ. P. 56(c).  The Supreme Court has explained that a dispute about a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248; see also id. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial.")).

A genuine factual dispute is material if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248.  Applicable substantive law governs which facts are critical and which are irrelevant.  Id.; see also Nebraska v. Wyoming, 507 U.S. 584, 590 (providing that when decided if a material factual dispute exists, a court must "view[] the evidence

40

through the prism of the controlling legal standard"). The Court has been clear that if the record contains disputes about facts that are "irrelevant or unnecessary," the materiality element is not met. Anderson, 477 U.S. at 248. And if the evidence presented to support a claim or defense "is merely colorable or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citing Cities Serv., 391 U.S. at 290; Dombrowski v. Eastland, 387 U.S. 82 (1967) (per curiam) (citations omitted)); see also Matsushita Elec. Indus. Co., 475 U.S. at 586 (explaining that a nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

Procedurally, the "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" by pointing to places in the record demonstrating the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The resisting party must then go beyond the pleadings and present "'specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)); see Celotex Corp., 477 U.S. at 324 (requiring a nonmoving party to resist a properly supported motion "by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file" to "designate specific facts showing that there is a genuine issue for trial" (quotation marks omitted)). If a party bears the burden of proof at trial, summary judgment is appropriate against that party if it "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322; see also Nebraska v. Wyoming, 507 U.S. at 590; Lujan v. Nat'l Wildlife Found., 497 U.S. 871, 884 (1990). Under these circumstances, "[t]he moving party is 'entitled to judgment as a matter of law' because the

nonmoving party has failed to make a sufficient showing on an essential element of [its] case." Celotex Corp., 477 U.S. at 323; Lujan, 497 U.S. at 884.

Throughout this process, the Court must view the evidence and inferences from the record in a light favorable to the nonmoving party, see Anderson, 477 U.S. at 255, and presume the nonmoving party's version of a disputed issue is the correct one, Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 339 (1982), and steer clear of performing functions such as making "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," Anderson, 477 U.S. at 255.  If, at the conclusion of this process, "it is quite clear what the truth is," summary judgment may be granted, for "the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try."  Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 467 (1962) (quoting Sartor v. Ark. Natural Gas Corp., 321 U.S. 620, 627 (1944)).

Our circuit has recommended "caution" when considering summary judgment motions in employment discrimination cases because of "the fact-specific nature of each case."  Mershon v. St. Louis Univ., 442 F.3d 1069, 1073 (8th Cir. 2006); accord Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1117-18 (8th Cir. 2006) (summary judgment should be "sparingly" used in employment discrimination cases in the absence of direct evidence); Bass v. SBC Commc'ns, Inc., 418 F.3d 870, 873 (8th Cir. 2005) (summary judgment should "'seldom be granted in the context of employment actions as such actions are inherently fact based'" (quoting Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003)); Peterson v. Scott County, 406 F.3d 515, 520 (8th Cir. 2005) ("Summary judgment should seldom be granted in employment discrimina-tion cases because intent is often the central issue and claims are often based on inference.").

Simultaneously, the court has recommended summary judgment be viewed as a tool used to excise from jury consideration those cases "'when a plaintiff fails to establish a factual dispute on an essential element of [the] case.'" Mershon, 442 F.3d at 1073-74 (quoting Simpson v. Des Moines Water Works, 425 F.3d 538, 542 (8th Cir. 2005) (alteration by the Mershon court); see also Celotex Corp., 477 U.S. at 323-24, 327 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and . . . it should be interpreted in a way that allows it to accomplish this purpose" of serving "not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole.").

Educated by these standards, the Court turns to the parties' arguments.

**B.    Napreljac's Disability Discrimination Claims.**

Although each party has moved for summary judgment on Napreljac's disability discrim-ination claims brought under the ADA and the ICRA, the following discussion tracks the record read favorably to Napreljac.

**1.    Legal Standards for Disability Discrimination Claims.**

The ADA makes it unlawful for a "covered entity . . . [to] discriminate against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). Under the ICRA, it is unlawful to discharge an employee on the basis of the employee's disability, "unless based upon the nature of the occupation." Iowa Code § 216.6(1)(a) (2006).[20]

There are two avenues of proof available to a plaintiff bringing a disability discrimination claim premised on the ADA. One option is to present direct evidence of discrimination. In

---

[20] Disability discrimination claims advanced under the ICRA are analyzed the same way as ADA-based disability discrimination claims. See Nuzum v. Ozark Auto. Distribs, Inc., 432 F.3d 839, 842 n.2 (8th Cir. 2005); Simpson, 425 F.3d at 542 n.3; Fuller v. Iowa Dep't of Human Servs., 576 N.W.2d 324, 329 (Iowa 1998).

disability discrimination cases, our circuit has defined "direct evidence" as evidence raising an inference "that the adverse action was more likely than not based on a discriminatory criterion illegal under federal law."  Lowery v. Hazelwood Sch. Dist., 244 F.3d 654, 658 (8th Cir. 2001); cf. Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 835 (8th Cir. 2000) (defining direct evidence in an ADEA claim as that "demonstrat[ing] a specific link between the challenged employment action and the alleged animus").  Because Napreljac does not argue this type of evidence exists in the present record, his case must be evaluated under the alternative burden-shifting framework pioneered in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and refined in  Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), United States Postal Service Board of Governors v. Aikens, 460 U.S. 711 (1983), and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).[21]  See Thompson v. Bi-State Dev. Agency, 463 F.3d 821, 824-25 (8th Cir. 2006); Baucom v. Holiday Cos., 428 F.3d 764, 766 (8th Cir. 2005); Simpson, 425 F.3d at 542;  Bass, 418 F.3d at 873; Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1044 (8th Cir. 2005); Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1021 (8th Cir. 1998) (collecting cases).  The first step of that framework requires a plaintiff to marshal a prima facie case of disability discrimination.  To pass muster, a plaintiff must show (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without a reasonable accommodation, and (3) he suffered an adverse employment action because of his disability.  Thompson, 463 F.3d at 825; Samuels v. Kansas City Mo. Sch. Dist., 437 F.3d

---

[21] Napreljac's citation of Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), at oral argument demonstrates a misunderstanding of that decision's impact on employment discrimination cases at the summary judgment phase. See, e.g., Simpson, 425 F.3d at 542 n.4; Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004); Johnson v. AT&T Corp., 422 F.3d 756, 760 n.4 (8th Cir. 2005).

797, 801 (8th Cir. 2006); <u>Simpson</u>, 425 F.3d at 542; <u>Bass</u>, 418 F.3d at 873; <u>Henderson v. Ford</u>

<u>Motor Co.</u>, 403 F.3d 1026, 1034 (8th Cir. 2005); <u>Kratzer</u>, 398 F.3d at 1044; <u>Kincaid v. City of</u>

<u>Omaha</u>, 378 F.3d 799, 804 (8th Cir. 2004); <u>Ristrom v. Asbestos Workers Local 34 Joint</u>

<u>Apprentice Comm.</u>, 370 F.3d 763, 768 (8th Cir. 2004); <u>Epps v. City of Pine Lawn</u>, 353 F.3d 588,

591 (8th Cir. 2003); <u>Dropinski v. Douglas County</u>, 298 F.3d 704, 706 (8th Cir. 2002).  If a

plaintiff succeeds, the employer must offer a legitimate and nondiscriminatory reason for the

action it took.  <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Thompson</u>, 463 F.3d at 825; <u>Baucom</u>, 428

F.3d at 766; <u>Simpson</u>, 425 F.3d at 542;  <u>Bass</u>, 418 F.3d at 873; <u>Henderson</u>, 403 F.3d at 1034;

<u>Kratzer</u>, 398 F.3d at 1044; <u>Kincaid</u>, 378 F.3d at 804.  If the employer points to such a reason, the

plaintiff may only succeed by showing the employer's justification for the adverse employment

action is a pretext for discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 804;  <u>Thompson</u>, 463

F.3d at 825; <u>Baucom</u>, 428 F.3d at 766-67; <u>Simpson</u>, 425 F.3d at 542;  <u>Bass</u>, 418 F.3d at 873;

<u>Henderson</u>, 403 F.3d at 1034; <u>Kratzer</u>, 398 F.3d at 1044; <u>Kincaid</u>, 378 F.3d at 804.

### 2.   Analysis.

#### a.   Napreljac's <u>Prima</u> <u>Facie</u> Case.

The first prong of Napreljac's <u>prima</u> <u>facie</u> case requires him to show he was disabled, as

that term is used in ADA nomenclature.

##### i.   Was Napreljac Disabled?

The ADA prohibits discrimination against "a qualified individual with a disability."  42

U.S.C. § 12112(a).  A "qualified individual with a disability" is one "with a disability who, with

or without reasonable accommodation, can perform the essential functions of the employment

position that such individual holds or desires."  <u>Id.</u> § 12111(8).  Disability is defined as "(A) a

physical or mental impairment that substantially limits one or more of the major life activities of

such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  Id. § 12102(2).  Because Napreljac claims he was terminated because he suffered from an actual disability, his case is tested under the first definition.  The only major life activity Napreljac claims was substantially impaired is working.[22]

The Court must first decide whether Napreljac has generated a fact question regarding whether he satisfied this "demanding standard", Toyota Motor Mfg. v. Williams, 534 U.S. 184, 197 (2000); Ristrom, 370 F.3d at 768, "as of the time of the employment decision," Samuels, 437 F.3d at 802; see Browning v. Liberty Mut. Ins. Co., 178 F.3d 1043, 1047 (8th Cir. 1999).  Deciding whether a person is disabled under the ADA consists of a two-part inquiry:  "the individual must have (1) 'a physical or mental impairment' that (2) 'substantially limits one or more major life activities' of the individual."  Nuzum, 432 F.3d at 843.

Two bodies of regulations provide guidance to interpreting the ADA's definition of disability:  regulations promulgated by the Department of Health, Education, and Welfare (now the Department of Health and Human Services (HHS)) interpreting the Rehabilitation Act of 1973, and EEOC regulations interpreting the ADA.  Toyota Motor Mfg., 534 U.S. at 193-94.  The Supreme Court has recognized that because "Congress drew the ADA's definition of disability almost verbatim from the definition of 'handicapped individual' in the Rehabilitation Act, and Congress' repetition of a well-established term generally implies that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations,"

---

[22] Critically, Napreljac does not claim a substantial limitation on the major life activity of lifting.  See Pl.'s Br. in Support of Pl.'s Resistance to Def.'s Mot. to Dismiss & Summ. J., at 32 ("The Plaintiff is substantially limited in the major life activity of working." (emphasis added)); Pl.'s Br. in Support of Pl.'s Mot. for Partial Summ. J., at 13 (same); Pl.'s Reply Br. in Support of Pl.'s Mot. for Summ. J., at 4 ("The Plaintiff's argument concerning disability is that he is substantially limited in the major life activity of working.").

regulations interpreting that act carry significant weight.  Id. at 193-94 (citations omitted).  The Court further noted that Congress provided in the ADA that "'[e]xcept as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. § 790 et seq. [(1988)]) or the regulations issued by Federal agencies pursuant to such title.'"  Id. at 194 (quoting 42 U.S.C. § 12201(a)).  The endorsement of HHS regulations by both Congress and the Supreme Court is thus clear.

"The persuasive authority of the EEOC regulations is less clear," in part, because "no agency has been given authority to issue regulations interpreting the term 'disability' in the ADA."  Toyota Motor Mfg., 534 U.S. at 194; see also Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 563 n.10 (1999); Sutton v. United Air Lines, Inc., 527 U.S. 471, 479 (1999).  The EEOC has done so anyway.  See 29 C.F.R. § 1630.2 (2006).  The Court has passed on determining the level of deference to afford the EEOC's regulations because the parties before it have always accepted them as reasonable.  E.g., Toyota Motor Mfg., 534 U.S. at 194.  By relying on the EEOC's regulations in their filings, the parties here have done so as well.

Establishing that one is disabled under the ADA is not trivial.  Rather, it "is a significant hurdle that can prevent a person who was denied a job because of an impairment from being covered by the ADA."  Nuzum, 432 F.3d at 842-43, at *2; accord Didier v. Schwan Food Co., — F.3d —, 2006 WL 2934290 (8th Cir. 2006).  The analysis requires a close examination of the particular condition claimed by the plaintiff with an eye toward the individual characteristics of his particular case.  See Toyota Motor Mfg., 534 U.S. at 198-99; Sutton, 527 U.S. at 483.

The analysis begins by applying the two-step test outlined above, as informed by regulations promulgated by the EEOC and HHS.

47

### (a)  Did Napreljac Have a "Physical or Mental Impairment"?

Napreljac must first point to portions of the record generating a fact question regarding whether he had a physical or mental impairment. 42 U.S.C. § 12102(2)(A); Toyota Motor Mfg., 534 U.S. at 194; Nuzum, 432 F.3d at 843.  HHS regulations define "physical or mental impairment," to mean the following:

> (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psycho-logical disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

45 C.F.R. § 84.3(j)(2)(i).  Aside from grammatical differences, the EEOC's definitions are identical.  See 29 C.F.R. § 1630.2(h).  A wide variety of ills, including epilepsy, tendinitis, attention deficit disorder, irritable bowel syndrome, and depression qualify as impairments under these regulations.  See Nuzum, 432 F.3d at 843; Ristrom, 370 F.3d at 769; Brunke v. Goodyear Tire & Rubber Co., 344 F.3d 819, 821 (8th Cir. 2003); Maziarka v. Mills Fleet Farm, Inc., 245 F.3d 675, 679 (8th Cir. 2001).  Disorders or conditions affecting the musculoskeletal system qualify as a physical impairment.  29 C.F.R. § 1630.2(h); 45 C.F.R. § 84.3(j)(2)(i).  Napreljac claims to have suffered from a physical impairment of this type as a result of injuries sustained to his back and neck.

The record supports Napreljac's claim.  The record shows Napreljac received temporary work restrictions on August 5, 2003, when Napreljac visited a physician complaining of back pain resulting from a workplace injury.  He was released with a ten-pound lifting and pulling restriction and could not bend over more than ten times per hour.  He returned to the physician

on August 7, 2003, and received further restrictions.  At that point in time, Napreljac could not lift more than five pounds, push or pull more than ten pounds, and was not to bend over more than five times per hour.  These restrictions were in place when Napreljac was terminated.

Further, Dr. Minervini's notes following Napreljac's September 18 incident indicate that although Napreljac could return to work the next day – Dr. Minervini and Napreljac were both unaware of Napreljac's pending suspension – he would be restricted from lifting, pushing, or pulling more than five pounds of force and bending more than five times per hour.  Dr. Minervini diagnosed Napreljac with a mild lumbar strain and recommended he see an orthopedic surgeon.

Viewed favorably to Napreljac, the record contains a genuine issue of material fact regarding whether he suffered from a physical impairment on the date of his termination.

### (b)  Did Napreljac's Physical Impairment Substantially Limit One or More Major Life Activities?

The more difficult issue for Napreljac to scale is whether his identified physical impairment substantially limited one or more major life activities.  A medical diagnosis of an impairment noted above, while sufficient to satisfy the burden of identifying a physical impairment, is insufficient to show the impairment substantially limits a major life activity.  See Toyota Motor Mfg., 534 U.S. at 198 ("It is insufficient for individuals . . . to merely submit evidence of a medical diagnosis of an impairment.").

The EEOC's nonexhaustive definition of "major life activities" includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i); accord 45 C.F.R. § 84.3(j)(2)(ii) (HHS regulations).

To show a "substantial limitation" upon a major life activity, EEOC regulations require that the individual be "[u]nable to perform a major life activity that the average person in the general population can perform"; or be "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." Id. § 1630.2(j)(1). EEOC regulations recommend considering several factors, including the nature and severity of the impairment, the duration or expected duration of the impairment, and the long-term impact resulting from the impairment. See id. § 1630.2(j)(2).

The Supreme Court has explained that passing through the portal between a limitation and a "substantial limitation" is neither epigrammatic nor easy. Noting Congress chose to incorporate the word "substantially" into the phrase "substantially limits," the Court reasoned an impairment "'considerable' or 'to a large degree'" was required. Toyota Motor Mfg., 534 U.S. at 196. The impairment must "prevent[] or severely restrict[] the individual from doing activities that are of central importance to most people's daily lives." Id. at 198. Only impairments with "permanent or long term" impacts are eligible. Id. (citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii) (2001)); accord Samuels, 437 F.3d at 802 ("[T]emporary impairments with little or no long-term impact are not disabilities.").

Because the major life activity Napreljac claims to have been substantially limited in performing is working, this case presents an additional complication. Although the EEOC has specifically labeled "working" as a major life activity, the Supreme Court has reserved judgment regarding whether it qualifies as a major life activity under the ADA. Toyota Motor Mfg., 534 U.S. at 200. Our circuit has not. See Breitkreutz v. Cambrex Charles City, Inc., 450 F.3d 780,

784 (8th Cir. 2006) (2-1 opinion) (working qualifies as a major life activity); <u>Nuzum</u>, 432 F.3d at

844 (same); <u>Webner v. Titan Distrib., Inc.</u>, 267 F.3d 828, 834-35 (8th Cir. 2001) (same);

<u>Fjellestad v. Pizza Hut of Am., Inc.</u>, 188 F.3d 944, 949 (8th Cir. 1999) (same).[23]

Further, when the plaintiff claims an impairment has substantially limited the major life

activity of working, he must satisfy a "specialized" test. <u>Schuler</u>, 336 F.3d at 704. The term

"substantially limited" when used in connection with the major life activity of working carries

additional features:

> The term substantially limits means significantly restricted in the ability to
> perform either a class of jobs or a broad range of jobs in various classes as
> compared to the average person having comparable training, skills and
> abilities. The inability to perform a single, particular job does not constitute
> a substantial limitation in the major life activity of working.

---

[23] The notion that working could qualify as a major life activity has not been an easy
tablet to swallow. The Supreme Court has written that "[b]ecause of the conceptual difficulties
inherent in the argument that working could be a major life activity, [the Court has] been hesitant
to hold as much." <u>Toyota Motor Mfg.</u>, 534 U.S. at 200; <u>see also</u> <u>Sutton</u>, 527 U.S. at 492. Our
circuit has since echoed the same difficulties, explaining,

> Because the ultimate question to be answered in this kind of case is whether a
> person was denied the opportunity to work because of a disability, it is
> questionable logic that would resolve that inquiry by determining whether a
> person is, or is perceived to be, substantially limited in his ability to work.

<u>Schuler v. SuperValu, Inc.</u>, 336 F.3d 702, 704 (8th Cir. 2003). Nevertheless, upon examination
of the EEOC's regulations and observing that the Supreme Court, despite its reservations con-
cerning the regulations' validity had yet to hold they were invalid, our circuit endorsed working
as a major life activity under the ADA. <u>Id.</u> (discussing <u>Toyota Motor Mfg.</u>, 534 U.S. at 194;
<u>Sutton</u>, 527 U.S. at 479; and 29 C.F.R. § 1630.2(i); (j)(3)(i)); <u>see also</u> <u>Orr v. Wal-Mart Stores,
Inc.</u>, 297 F.3d 720, 724 n.3 (8th Cir. 2002) ("In this circuit we have . . . assum[ed], without
conclusively ruling, that working constitutes a major life activity for purposes of applying the
ADA."). <u>But see</u> <u>Anderson v. North Dakota State Hosp.</u>, 232 F.3d 634, 636 (8th Cir. 2000)
("[W]orking is clearly a major life activity."); <u>Wooten v. Farmland Foods</u>, 58 F.3d 382, 385-86
(8th Cir. 1995) ("The ADA regulations include 'working' as a 'major life activity' which, if
substantially limited or regarded as substantially limited by an impairment, would qualify a
person as disabled within the meaning of the ADA.").

29 C.F.R. 1630.2(j)(3)(i); <u>see also</u> <u>Sutton</u>, 527 U.S. at 491 ("When the major life activity under consideration is that of working, . . . 'substantially limits' requires, at a minimum, [that the plaintiff is] unable to work in a broad class of jobs.")[24]

Our circuit has interpreted this standard strictly.  See <u>Samuels</u>, 437 F.3d at 801-03 (plaintiff not substantially limited in the major life activity of working even when temporarily restricted to working part-time and was subject to a two-month lifting and reaching restriction in the absence of physician's notes indicating chronic conditions and an inability to work); <u>Wood v. Crown Redi-Mix, Inc.</u>, 339 F.3d 682, 686 (8th Cir. 2003) (plaintiff not substantially limited in the major life activity of working where although he was prevented "from driving only a ready-mix concrete truck," he could drive other trucks); <u>Schuler</u>, 336 F.3d at 705 (plaintiff, a sufferer of epilepsy, not substantially limited in the major life activity of working where although he could not perform the essential functions of a warehouse order selector, he had not shown an inability to perform other jobs utilizing his skills, such as manual labor positions or other warehouse jobs); <u>cf. Shipley v. City of University City</u>, 195 F.3d 1020, 1023 (8th Cir. 1999)

---

[24] In addition to guidelines used to determine if an individual is substantially limited in more generic life activities, the EEOC has recommended consideration of the following special factors when the claimed impairment substantially limits a plaintiff from working:
  (A)  The geographical area to which the individual has reasonable access;
  (B)  The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
  (C)  The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).
29 C.F.R. § 1630.2(j)(3)(ii).

(plaintiff not regarded as having a substantial limitation in the major life activity of working where the plaintiff was regarded as being only unable to perform the job requirements of a firefighter); Wooten, 58 F.3d at 386 (employee not regarded as having a substantial limitation in the major life activity of working where a physician indicated the plaintiff was "restricted to light duty work with no meat products and no work in a cold environment," even though work with those restrictions was not available at the plaintiff's place of employment and even if plaintiff's employer believed the restrictions were permanent).  To satisfy this standard, a diminishment in "'overall employment opportunities'" must exist.  Breitkreutz, 450 F.3d at 784 (quoting Miller v. City of Springfield, 146 F.3d 612, 614-15 (8th Cir. 1998)); accord Wood, 339 F.3d at 686; Fjellestad, 188 F.3d at 944.

Turning to the case at hand, Napreljac first relies on his lifting, pushing, pulling, and bending restrictions as evidence that he was substantially limited in the major life activity of working because he was unable to work in areas requiring medium or heavy physical labor.  First, the record shows Napreljac was released from his physician's care with "no restrictions" on March 6, 2003.  As a result, medical records showing injuries prior to that date have limited relevance in establishing a substantial limitation on his ability to work.  Further, even if Napreljac was substantially limited in his ability to work in 2001, the record shows he was able to return to his normal job responsibilities – including his performance of the Holi-Care program – after his return to work following that injury.

The restrictions following Napreljac's August 4 injury, however, require closer discussion.  On that date, Napreljac aggravated a prior back injury sustained at work.  His injury was diagnosed as a "low back strain."  The record shows Napreljac's physician placed restrictions on work Napreljac was able to perform.  Although his physician's initial assessment indi-

53

cated Napreljac would require physical therapy for two weeks and could then work at full

strength, the record shows he was still following restrictions on September 18, 2003.

     Examining lifting restrictions in the context of ADA claims is not a groundbreaking

exercise.  The Eighth Circuit has noted that while a

> "lifting restriction standing alone is insufficient to demonstrate that [the
> plaintiff] was substantially limited in the life activity of working, the
> inability to lift heavy objects can translate across a broad spectrum of
> physically demanding jobs.  Even if such a result is possible, it would
> depend on proof that the limitation forecloses the broad category of jobs for
> which [plaintiff's] background and skills otherwise would fit him."

Breitkreutz, 450 F.3d at 784 (quoting Nuzum, 432 F.3d at 848 (alterations by the Breitkreutz

court)); see also Brunko v. Mercy Hosp., 260 F.3d 939, 941 (8th Cir. 2001) (40-pound lifting

restriction insufficient to substantially limit major life activity of working); Mellon v. Fed.

Express Corp., 239 F.3d 954, 957 (8th Cir. 2001 (15-pound lifting restriction with caution to

avoid "stresses" on plaintiff's arm insufficient); Snow v. Ridgeview Med. Ctr., 128 F.3d 1021,

1207 (8th Cir. 1997) (25-pound lifting restriction and restriction preventing plaintiff from

pushing heaving objects does not substantially limit major life activity of working); Helfter v.

United Parcel Serv., Inc., 115 F.3d 613, 617-18 (8th Cir. 1997) (restrictions preventing the

plaintiff from performing sustained, repetitive activities with either hand or lifting more than ten

pounds frequently and twenty pounds occasionally disqualified plaintiff only from jobs requiring

"a substantial amount of sustained repetitive motion and heavy lifting); Aucutt v. Six Flags Over

Mid-America, Inc., 85 F.3d 1311, 1319 (8th Cir. 1996) (25-pound lifting restriction, even when

coupled with diagnosed angina, high blood pressure, and coronary artery disease insufficient to

limit plaintiff's overall employment opportunities); cf. Gutridge v. Clure, 153 F.3d 898, 901 (8th

Cir. 1998) (permanent 45-pound lifting restriction does not substantially limit the major life

activity of lifting).  But see Webner, 267 F.3d at 834 (plaintiff substantially limited in the major

life activity of working when injuries "limited his ability to walk, to stand for long periods of

time, to twist, and to bend at the waist without pain," ultimately affecting his ability to work, and

medical testimony showed the plaintiff "had an impairment rating of 18% of the body as a whole

after his three back surgeries, was only authorized to return to work incrementally subject to

bending and lifting restrictions, and required physical therapy").

Napreljac testified that despite his physical limitations, he believed he was able to per-

form his assigned job responsibilities on September 18, 2003.  Medical records produced after

the September 18 incident show any restrictions resulting from that incident or carrying over

from his previous injuries were temporary.  More specifically, Dr. Minervini predicted the

"anticipated date of maximum medical improvement" was October 2, 2003.  At a visit on

September 29, Napreljac's physician recommended therapeutic exercises but issued no restric-

tions on Napreljac's activities.  At another visit on October 8, his treating physician noted his

condition was slowly improving.  Napreljac was again released with instructions to perform

exercises.  While Napreljac reported pain on October 23, 2003, by November 4, his treating

physician had indicated Napreljac's aggravation was "temporary" and did not expect any

"permanent type of disability rating" would be required.  In early 2004, Napreljac was released

back to regular duty with a note from his physician indicating he did "not feel [Napreljac]

sustained any permanent impairment."  Although Napreljac sought treatment in December 2004

at his attorney's request for "increasing back pain," his treating physician was suspicious of his

lawyer's "intent" for sending him and recommended he continue with therapeutic exercises.[25]

---

[25] Relying on a letter prepared at his attorney's request by Dr. Peter Wirtz on June 22,
2005, Napreljac claims he is limited to "physical capabilities of light physical demand" as a

Importantly, no medical professional recommended Napreljac not work.  See Samuels, 437 F.3d at 802 (finding persuasive that plaintiff's physician, despite noting several activities plaintiff should avoid, did not state plaintiff was incapable of working).  In fact, the record shows physicians repeatedly indicated Napreljac could work with restrictions.  The record further shows that before his termination, JQH permitted him to work with restrictions, often fitting his assigned tasks to the restrictions imposed at various points in time.

Napreljac's actions following his termination are also relevant.  In addition to showing Napreljac was involved to some degree with remodeling a home, the record shows Napreljac began working at another hotel in the same geographic area in a position more physically demanding than his job at JQH.  While Napreljac claims his new job was supervisory in nature, he testified to participating in the hotel's remodel.  His employment at the time of his deposition in early 2006 required him to lift boxes of medicine.  Thus, the record shows Napreljac secured employment in the same class of jobs requiring the same skills in the same geographical area as his position at JQH.  See Nuzum, 432 F.3d at 848 ("Ability to do another job of the same general class is inconsistent with a substantial limitation on the major life activity of working."); Brunko, 260 F.3d at 942 (plaintiff's work in several nursing jobs after leaving former job as a nurse coupled with evidence that her former employer offered her other positions not exceeding her limitations constitutes evidence that plaintiff was not substantially limited in the major life activity of working); Wood, 339 F.3d at 686 (employment in similar line of work eliminates fact questions regarding substantial limitations on plaintiff's ability to work).

---

result of a cervical spine condition.  This evaluation carries little weight because it was per-formed nearly two years after Napreljac's termination.  See Samuels, 437 F.3d at 802 (dis-counting recommendation of a physician who examined the plaintiff "nearly one year" after a request for accommodations).

Finally, Napreljac's argument that he was "temporarily disabled" because of restrictions imposed upon him is unavailing.  The law in this circuit is clear that if a person is temporarily disabled, they are not "disabled" under the ADA.  See Samuels, 437 F.3d at 802 ("[T]emporary impairments with little or no long-term impact are not disabilities."); see also Simonson v. Trinity Reg'l Health Sys., 336 F.3d 706, 709 (8th Cir. 2003) (failing to locate authority suggesting temporary work restrictions constitute an impairment or that such restrictions are evidence that her employer regarded her as having an impairment substantially limiting her major life activity of working).  While severe permanent restrictions can suffice as a signification limitation, see Fjellestad, 188 F.3d at 949, Napreljac's classification of his own disability as "temporary" reveals this is not his argument.

Even viewing the record favorably to Napreljac, the Court concludes no fact questions exist regarding whether Napreljac's back and neck conditions substantially limited him in the major life activity of working.  While he was burdened with physical restrictions, JQH tailored his responsibilities to those restrictions, permitting him to work.  Napreljac was able to secure employment following his termination from JQH during which he performed tasks requiring similar physical abilities as his employment with JQH.[26]

---

[26] Napreljac relies extensively on Wheaton v. Ogden Newspapers, Inc., 66 F. Supp. 2d 1053 (N.D. Iowa 1999).  There, a vocational expert testified that the plaintiff was "incapable of performing any jobs within the medium, heavy, and very heavy labor classifications."  Wheaton, 66 F. Supp. 2d at 1063.  Coupled with the plaintiff's testimony regarding her impairment and its significant impact on her ability to work, the court located a fact question on the issue of whether the plaintiff was substantially limited in the major life activity of working.  Id. at 1063-64.  Napreljac's deposition contains no specific information regarding his ability to work; instead, it is littered with physical tasks he has undertaken at and after the time of his termination.  Further, unlike the vocational expert in Wheaton, Napreljac's medical records created around the time of his termination did not indicate any significant permanent injuries resulted from either his September 18 injury or any previous injuries.  Wheaton is distinguishable, rendering Napreljac's reliance upon it unavailing.

The ADA protects persons whose "impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken." Sutton, 527 U.S. at 482.  Napreljac is not the former.  Because the record contains no genuine issue of material fact regarding whether Napreljac's physical impairment substantially limited him in the major life activity of working, JQH is entitled to summary judgment on his disability discrimination claims.

### ii.   Was Napreljac A "Qualified Individual with a Disability"?

Assuming *arguendo* Napreljac could generate a fact question on the first prong of his prima facie case, he must then generate a fact question regarding whether he was a qualified individual with a  disability.  See 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.2(m).  Satisfaction of this prong requires passage of a two-part test.  First, the court must determine if the individual possesses the required skills, education, experience, and training for the position.  Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 900 (8th Cir. 2006); Maziarka, 245 F.3d at 680; Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 787 (8th Cir. 1998); see 29 C.F.R. § 1630.2(m).  JQH's engineer position primarily utilizes manual labor, and requires no particu-larized skills or education.  Napreljac easily meets this standard.

Second, the court must decide if the individual could perform the essential functions of the position, either with or without a reasonable accommodation.  Canny, 439 F.3d at 900; Maziarka, 245 F.3d at 680; Moritz, 147 F.3d at 787.  Essential functions are those "fundamental job duties of the employment position the individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1).  Marginal functions of the position are not essential.  Id.  Functions an employer considers essential, such as those contained in a written employment description, as

well as the amount of time spent performing particular functions perceived as essential are evidence of the essential functions of a position.  See 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3).  The Eighth Circuit has repeatedly endorsed these standards.  E.g., Canny, 439 F.3d at 900; Alexander v. Northland Inn, 321 F.3d 723, 727 (8th Cir. 2003); Summerville v. TransWorld Airlines, Inc., 219 F.3d 855, 858 (8th Cir. 2000); Moritz, 147 F.3d at 787.

As more fully explained in the "position description" quoted above, the JQH engineer position requires the ability to exert 10 to 20 pounds of force over two-thirds of the time, 25 to 50 pounds one-third to two-thirds of the time, and 50 to 100 pounds of force up to one-third of the time.  As a result of Napreljac's physical restrictions in place at the time of his termination, Napreljac was not capable of performing these duties.

JQH created a "light duty" category of work as an accommodation for employees, including engineers, recovering from temporary injuries.  The record shows Napreljac performed duties in this category when he was under physical restrictions imposed by his physicians.  This type of "job restructuring" constitutes a reasonable accommodation under the ADA.  42 U.S.C. § 12111(9)(B).  As a result, the record shows Napreljac was able, as a result of a reasonable accommodation, to perform his job duties at the time of his termination.

The Court concludes a genuine issue of material fact exists with respect to whether Napreljac could perform the essential functions of his job with or without a reasonable accommodation.

### iii.   Was Napreljac Terminated Because of His Disability?

Assuming Napreljac suffered from a disability and was able to complete the essential functions of his position with or without a reasonable accommodation, the record must contain a genuine issue of material fact with respect to whether he was terminated as a result of his

disability.  To satisfy this element, a plaintiff must point to "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." Griffith, 387 F.3d at 736 (quoting Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997)); accord Simpson, 425 F.3d at 542.  Evidence that an adverse employment action occurred under circumstances giving rise to an inference of discrimination is sufficient, so long as the purported disability "played [a] role" in the termination.  Simpson, 425 F.3d at 542-43; cf. Gilooly v. Missouri Dep't of Health & Human Servs., 421 F.3d 734, 739 (8th Cir. 2005) (holding same in a retaliation case brought under Title VII).

Napreljac first argues he was terminated the same day he complained about pain in his back.  This contention is untrue.  Napreljac complained of back injuries arising out of his descent from the east loading dock stairs on September 18, but was not terminated until September 24. Napreljac was suspended, and while suspensions can be adverse employment actions, cf., e.g., McClure v. Career Sys. Dev. Corp., 447 F.3d 1133, 1137 (8th Cir. 2006) (suspension without pay is an adverse employment action under section 1981); but see Moisant v. Air Midwest Inc., 291 F.3d 1028, 1031-32 (8th Cir. 2002) (suspension with pay not an adverse employment action when the plaintiff was permitted to stay at home to recover from a sexual assault allegedly occurring at her workplace), Napreljac does not make this argument.  Even if he did, while the temporal proximity of Napreljac's complaints of additional pain and his termination is close, our circuit has cautioned that cases where timing alone can generate a fact question on the causation element are "rare."  Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1020 (8th Cir. 2005); cf. Webner, 267 F.3d at 835-36 (8th Cir. 2001) (termination four days after engagement in protected activity, "standing alone [was] insufficient to support a retaliatory discharge claim," but when

60

combined with other evidence, gave rise to inference of improper termination); Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1113-14 (8th Cir. 2001) (matter of weeks between employer's awareness of disability and termination bolstered with comments and conversations with superiors sufficient to create an inference of retaliation); Kiel v. Select Artificals, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (holding that "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue" in a retaliation case). Additionally, many events intervened between Napreljac's suspension and termination. The record shows Kaufman led an extensive investigation into the truth of Napreljac's statements that he was injured while on the loading dock of the hotel during the pursuit of his job duties. As a result, the inferential isthmus between Napreljac's alleged disability and his termination is eroded further still.

In addition to timing, Napreljac argues his annual performance review was supposed to begin in September 2003 but was never commenced. The record shows Napreljac was terminated before September 2003 drew to a close, so his performance review was not necessarily tardy. But assuming his position to be true, a delayed performance review is clearly not the kind of fact radiating impropriety which is sufficient to generate a fact question on causation.

Napreljac also argues that employees of JQH, after learning about his complaints, "grew agitated about the Plaintiff's temporary inability to perform his job functions and decided to terminate the Plaintiff's employment before they were saddled with a potential disability [claim]." The record shows Napreljac's complaints of pain resulting from workplace injuries began in 2001 and continued through 2003. Throughout that period, there were times during which Napreljac was unable to perform his job responsibilities. However, Napreljac has pointed to no place in the record showing any JQH employee harbored animosity toward him as a result

of his restrictions.  Notably, the record is devoid of evidence (and so are Napreljac's briefs) that

a supervisor or other JQH employee made statements or engaged in any conduct suggesting

Napreljac's termination was motivated in any way by his alleged disability.  Additionally,

Napreljac points to no evidence suggesting nondisabled employees were treated differently.  <u>See</u>

<u>Simpson</u>, 425 F.3d at 543 (insufficient evidence to show an adverse employment action arose

under circumstances giving rise to an inference of discrimination when the record was "devoid

of any indication that employees of the [defendant] harbored animosity towards persons with

disabilities or that similarly-situated nondisabled employees were treated more favorably than

[the plaintiff]" (citing <u>Lowery</u>, 244 F.3d at 657, 659-60)).

Finally, while the record contains notes prepared by JQH employees suggesting portions

of Napreljac's job were too difficult for him while he was under restrictions on his physical

ability, that fact does not link Napreljac's termination to the reason for his inability to perform

those tasks.  Critically, after those notes were made, Napreljac was not fired; JQH merely found

other work for Napreljac to do.

Thus, Napreljac's argument reduces to an aggregate of timing and his own conclusory

allegations, which are insufficient.  <u>See</u> <u>Anderson</u>, 477 U.S. at 250 (requiring a nonmoving party

to point to "specific facts" showing a trial is necessary (quotation marks omitted)); <u>Matsushita</u>,

475 U.S. at 586 (requiring a nonmoving party to do more than demonstrate a "metaphysical

doubt as to the material facts").

### b.   JQH's Purported Legitimate, Nondiscriminatory Reason for Napreljac's Termination.

Assuming the record contains genuine issues of material fact on each element of

Napreljac's <u>prima</u> <u>facie</u> case, Napreljac would benefit from an inference of discrimination, and

JQH would be required to produce evidence of a legitimate, nondiscriminatory reason for his termination.  The burden of production placed upon a moving party "'is not onerous and the showing need not be made by a preponderance of the evidence.'"  Stallings v. Hussmann Corp., 447 F.3d 1041, 1051-52 (8th Cir. 2006) (quoting Wallace v. Sparks Health Sys., 415 F.3d 853, 860 (8th Cir. 2005)); accord Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 853 (8th Cir. 2005); see also Kratzer, 398 F.3d at 1046 ("This is a burden of production not proof.  The defendant need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor.'" (quoting Krenick v. County of Le Sueur, 47 F.3d 953, 958 (8th Cir. 1995))).

JQH claims Napreljac was terminated because the decision maker with respect to Napreljac's termination concluded Napreljac had told his supervisor he had fallen while collecting trash when an investigation proved he had not been collecting trash and had not fallen. Further, JQH argues Kaufman's investigation revealed Napreljac signed an accident investigation form containing false information.  The notice of termination indicates Napreljac falsified a company document, violated company rules, and either exaggerated or misrepresented facts during an inquiry into a potential workplace injury.  The law in this circuit is clear that violating a company policy or procedures constitutes a legitimate and nondiscriminatory reason for terminating an employee.  See, e.g., Quick. v. Wal-Mart Stores, Inc., 441 F.3d 606, 610 (8th Cir. 2006); Rodgers, 417 F.3d at 853; Kincaid, 378 F.3d at 804-05; Wheeler v. Aventis Pharms., 360 F.3d 853, 858 (8th Cir. 2004); Price v. S-B Power Tool, 75 F.3d 362, 365-66 (8th Cir. 1996); see also Putman v. Unity Health Sys., 348 F.3d 732, 736 (8th Cir. 2003) ("'Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.'" (quoting Kiel, 169 F.3d at 1135)).

63

As noted above, there is conflicting evidence regarding whether Napreljac signed the accident report or manifested a belief in its truth.  However, at this point in the analysis, JQH's burden is one of production, only.  JQH's evidence passes this standard.

> ### c.  Napreljac's Attempt to Show JQH's Purported Legitimate, Nondiscriminatory Reason is Pretext.

If JQH produces a legitimate and nondiscriminatory reason for Napreljac's termination, the burden returns to Napreljac to demonstrate the reason identified by JQH is actually a pretext for unlawful discrimination.  At this stage, the Plaintiff's burden "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." Burdine, 450 U.S. at 255.  Our circuit has elaborated that at this stage, "'a plaintiff must: (1) present evidence creating a fact issue as to whether the employer's proffered reason is pretextual; and (2) present evidence that supports a reasonable inference of unlawful discrim- ination.'"  Russell v. TG Mo. Corp., 340 F.3d 735, 743 (8th Cir. 2003) (quoting Young, 152 F.3d at 1023).  Evidence used by the Plaintiff to support a prima facie case can be considered in con- junction with other evidence to decide if a genuine issue of material fact exists with respect to the ultimate issue.  Wallace v. DTG Operations, Inc., 442 F.3d at 1120 & n.2.  As a result, a strong prima facie case coupled with evidence showing the employer's rationale for the termination is false can be sufficient to generate a genuine issue of material fact with respect to whether the employee was terminated for an improper reason.  Id. (discussing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000)); accord Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005); Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002).

There are at least two primary ways a plaintiff can overcome a showing of a legitimate and nondiscriminatory reason proffered by a defendant.  "First, a plaintiff may succeed 'indirectly by showing that the employer's proffered explanation is unworthy of credence' because it has 'no basis in fact.'"  Wallace v. DTG Operations, Inc., 442 F.3d at 1120 (8th Cir. 2006) (quoting Burdine, 450 U.S. at 256; Smith v. Allen Health Sys., Inc., 302 F.3d at 834); accord Stallings, 447 F.3d at 1052.  This method of proof, which "directly rebut[s] the proffered reason as false, usually involves more than a rebuttal of the employer's ultimate claims regarding its subjective motivations," and more "typically involves a broader rebuttal of the underlying factual claims."  Wallace v. DTG Operations, Inc., 442 F.3d at 1120; accord Stallings, 447 F.3d at 1502.  If the employer's explanation withstands analysis as "worthy of credence," the plaintiff does not succeed.  Burdine, 450 U.S. at 256.

Second, a plaintiff may prove pretext "'directly by persuading the court that a [prohibited] reason more likely motivated the employer.'"  Wallace v. DTG Operations, Inc., 442 F.3d at 1120 (quoting Burdine, 450 U.S. at 256 (alteration in the original)); accord Stallings, 447 F.3d at 1052.  Under this alternative, the employee need not rebut the underlying factual claims advanced by the defendant but must instead focus "on rebuttal of the employer's ultimate factual claim regarding the absence of [discriminatory] intent."  Wallace v. DTG Operations, Inc., 442 F.3d at 1121; accord Stallings, 447 F.3d at 1052.  The employee must show the record contains sufficient evidence of intentional discrimination for a reasonable fact finder to believe the plaintiff's allegations and conclude the employer's proffered reason was not the real reason for the termination.  Wallace v. DTG Operations, Inc., 442 F.3d at 1121.  Under this scenario, an "employee 'may concede that the proffered reason for the termination[] would have been a sufficient basis for the adverse employment action while arguing that the employer's proffered

reason was not the true reason." Stallings, 447 F.3d at 1053 (quoting Wallace v. DTG

Operations, Inc., 442 F.3d at 1121). Whichever path a plaintiff chooses to travel, he "must do

more than show that the employment action was ill-advised or unwise, but rather must show that

the employer has offered a 'phony excuse.'" Henderson, 403 F.3d at 1034.

The Eighth Circuit has recently summarized the most common methods to show pretext:

> An employee may prove pretext by demonstrating that the employer's
> proffered reason has no basis in fact, that the employee received a favorable
> review shortly before he was terminated, that similarly situated employees
> [were treated differently], that the employer changed its explanation for why
> it fired the employee, or that the employer deviated from its policies.

Stallings, 447 F.3d at 1053 (citing Smith v. Allen Health Sys., Inc., 302 F.3d at 834-35).[27]

Napreljac argues that because he neither made an untrue statement regarding his

September 18 injury nor signed or otherwise endorsed the report prepared as a result of his

accident, his termination must have been motivated by his disability. Unfortunately, this

argument misses the point. Napreljac was terminated because Kaufman believed he had not

been truthful during an accident investigation. To show he was terminated for an untenable

reason, Napreljac must generate a fact question regarding whether Kaufman's belief was

---

[27] At oral argument, Napreljac advanced a "shifting explanation" theory for his termina-
tion as evidence of pretext. He claims that Kaufman first alleged Napreljac was terminated
solely because he had falsified a company document until a state administrative law judge con-
cluded no records were falsified. At that point, Napreljac argues, Kaufman changed course to
argue that Napreljac was not truthful regarding the extent of his injuries.

The record shows this not to be the case. In addition to listing "falsification of a
company document," the notice of termination indicates Napreljac was fired because Kaufman's
"[i]nvestigation prove[d he] was not injured while picking up litter on said date of 9-18-03 on
said time of 8:30 a.m." This statement resulted from Kaufman's conclusions that Napreljac had
been untruthful by representing he had fallen and that he was not on the loading dock stairs
picking up trash at the time he represented. The state administrative law judge's conclusion that
Napreljac did not falsify a company document does not hinder the Court's reliance on the notice
of termination because Napreljac does not argue he was fired for falsifying that document.

reasonable.  The issue at this juncture is not whether Napreljac actually made material misrepresentations during Kaufman's investigation; the issue is whether Kaufman honestly believed Napreljac made material misrepresentations.  As a result, Napreljac's argument is misplaced.

Two recent cases fully illustrate what Napreljac must show.  In Mershon v. St. Louis University, a university student claimed he was banned from campus in retaliation for reporting a university's failure to accommodate his disability.  Mershon, 442 F.3d at 1074.  The student reported conduct of university officials to a government investigator.  Id. at 1073.  The government investigator related to an officer of the agency then known as the United States Federal Protection Services that the plaintiff had said he "want[ed] to put a bullet" in a specific professor's head as a result of interactions upsetting the student, who in turn told a university security official of his findings.  Id.  The plaintiff was then prohibited from entering the university's campus.  Id.

The court held that the plaintiff generated a fact question on each element of his prima facie case by showing that he reported conduct allegedly amounting to a failure to accommodate and was banned from campus the next day.  Id. at 1074.  The university argued the plaintiff's complaint was "perceived as a threat to harm a professor and that campus security simply acted to protect the University faculty and students from threatened violence."  Id.  While whether the student had actually made threats was an issue of dispute, that factual dispute was not material.  Id. at 1074-75.

The court noted that the plaintiff did not dispute that the university "sincerely perceived that he had made a threat" and that the investigator had "communicated to others her perception that he had made a threat."  Id.  The court concluded that "even assuming as true that [the

plaintiff] had never intended to harm [the professor], there is no dispute that the University

reasonably believed and acted upon [the government investigator's] report and her perception

that [the plaintiff] had made a threat against a faculty member." Id. at 1075.  Because the

plaintiff did not show "that the University's proffered explanation for the adverse action was

false or that the University acted in bad faith in relying on [the investigator's] report," he could

not rebut the university's reasons for banning him from campus even if he did not make the

threat against his professor.  Id.; see also Twymon v. Wells Fargo & Co., 462 F.3d 925, 935-36

(8th Cir. 2006) (upholding district court's conclusion that plaintiff, accused of violation a

corporate computer policy, failed to show pretext when the plaintiff "[did] not assert that [her

employer] did not honestly believe she was accountable for violations of the computer policy

when they fired her for those violations"); Johnson v. AT&T Corp., 422 F.3d at 762-63 (even if

an employer was mistaken in its belief that an employee made bomb threats, that fact does not

prove the employer was motivated by unlawful discrimination absent proof that the employer did

not honestly believe the employer made bomb threats); Scroggins v. Univ. of Minn. 221 F.3d

1042, 1045 (8th Cir. 2000) (cabining the relevant pretext inquiry to whether the employer

honestly believed an employee was guilty of conduct justifying the discharge).

A second case identified by JQH as a response to this Court's invitation to submit

supplemental briefing on this issue is in accord.  In EEOC v. Trans States Airlines, Inc., a race

and religion discrimination case advanced under Title VII and an analogous state statute, an

airline pilot was terminated for violating a company policy after he was allegedly seen in a hotel

bar in uniform.  EEOC v. Trans States Airlines, 462 F.3d 987, 992 (8th Cir. 2006).  Upholding

the district court's conclusion that the plaintiff had failed to rebut this legitimate, nondiscrim-

inatory reason for the pilot's termination, the court noted that whether the pilot actually violated

the company's policy was not a material dispute.  Id.  Instead, "[t]he relevant question is whether [the pilot] can show that [the airline] was motivated by a discriminatory animus, rather than solely by its belief that [the pilot] violated company policy."  Id. (citing Scroggins, 221 F.3d at 1045).

These cases teach that Napreljac must generate a fact question regarding whether Kaufman's explanation for his termination was false or dishonest, whether she that acted in bad faith in relying on the information she collected, or whether her reliance on that information was unreasonable.  See Trans States Airlines, 462 F.3d at 992; Twymon, 462 F.3d at 935-36; Mershon, 442 F.3d at 1075; Johnson v. AT&T Corp., 422 F.3d at 762-63.  As long as the record is devoid of fact questions on whether Kaufman housed an improper motive in her decision to terminate Napreljac, Napreljac still loses even if Napreljac receives the inference that Kaufman's investigation reached an incorrect conclusion.  Whether Napreljac actually violated a company policy or made false statements during the investigation after his injury is not relevant.

The record shows Kaufman believed Napreljac represented he had been picking up trash on the east loading dock of the hotel and had fallen at around 8:30 a.m.  After an intensive investigation, she concluded Napreljac was not working in the area he claimed at the time he claimed, was not doing the tasks he claimed, and was not injured in the manner he claimed.  Her decision to terminate was based on a review of the video surveillance footage by a variety of individuals, her conversations with her cadre of investigators, and a review of notes prepared by Dr. Minervini.  While Napreljac denies making false statements or exaggerating his injuries, these arguments bear on whether he actually violated a company rule or made false statements, not on whether JQH's conclusion that such a falsification or violation occurred was reasonable.  Indeed, the record shows Kaufman's reliance on her co-workers' statements was not unreasonable under

the circumstances or that her conclusion was reached in bad faith; rather, the record shows it was

Kaufman's normal business practice to consolidate information from a variety of sources in an

investigation.  It follows that Napreljac has not demonstrated JQH's legitimate and nondiscrim-

inatory reason for his termination is pretextual for unlawful discrimination.

### 3.   Conclusion.

Even if Napreljac receives the benefit of a favorable reading of the record, Napreljac

cannot generate a fact question regarding whether he was disabled at the time of his termination.

He cannot generate a fact question regarding whether he was terminated under circumstances

giving rise to an inference that his firing was precipitated by his purported disability.  Further,

Napreljac cannot show JQH's purported reason for his termination is a pretext for unlawful

discrimination.  Consequently, JQH's motion for summary judgment must be granted on

Napreljac's disability discrimination claims.  It follows that Napreljac's motion for summary

judgment on the same claim must be denied.

### C.   Napreljac's Race Discrimination Claim.

JQH has moved for summary judgment on Napreljac's claim that he was terminated

because of his race, but Napreljac has not resisted JQH's motion in this respect.  JQH is thus

entitled to summary judgment on this claim.  See Fed. R. Civ. P. 56(e) (providing that if a party

does not resist a motion for summary judgment as set forth in Rule 56, "summary judgment, if

appropriate, shall be entered against the adverse party" (emphasis added)); LR 56.1(c) ("If no

timely resistance to a motion for summary judgment is filed, the motion may be granted without

prior notice from the court.").  To the extent Napreljac's race discrimination claim overlaps with

his national origin discrimination claim, it is addressed below.  See Roxas v. Presentation

College, 90 F.3d 310, 316 (8th Cir. 1996) (citing MacDissi v. Valmont Indus., Inc., 856 F.2d

1054, 1059-60 (8th Cir. 1988) for the proposition that the "elements for claims of national origin

discrimination under Title VII and § 1981 [are] analyzed the same as claims for race discrimina-

tion under [the] same statutes"). Accordingly, in similar fashion to the Court's analysis below,

the Court finds summary judgment is "appropriate" on Napreljac's race discrimination claim.

See Fed. R. Civ. P. 56(e).

### D.   Napreljac's National Origin Discrimination Claims.

Next, JQH argues summary judgment is appropriate on Napreljac's national origin

discrimination claims. Napreljac's primary argument is that it is "plainly obvious" he has only a

"rudimentary understanding of the English language." He argues that when the investigation

culminating in this termination proceeded without an interpreter present, an inference arises that

JQH terminated him because of his national origin.

### 1.   Applicable Legal Principles.

Section 703(a) of the Civil Rights Act of 1964 makes it "an unlawful employment prac-

tice for an employer" to "discharge any individual . . . because of such individual's . . . race . . .

or national origin." Civil Rights Act of 1966 § 703(a), 42 U.S.C. § 2000e-2(a).[28]

A plaintiff may survive a motion for summary judgment assailing claims brought under

this section in one of two ways. First, a plaintiff may point to direct evidence of discrimination,

---

[28] The Iowa Civil Rights Act of 1965, as amended, Iowa Code ch. 216 (2006), makes it an "unfair or discriminatory practice" for a "[p]erson to . . . discharge any employee, or to otherwise discriminate in employment against . . . any employee . . . because of the . . . race [or] national origin . . . of such . . . employee, unless based upon the nature of the occupation." id. § 216.6(1)(a). Alleged violations of this statute are analyzed in the same way as Title VII claims. See Hannoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1045 (8th Cir. 2003); Vivian v. Madison, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore turn to federal law for guidance in evaluating the ICRA."); Pecenka v. Fareway Stores, Inc., 672 N.W.2d 800, 803 (Iowa 2003) (same).

"which 'is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action.'" Arraleh v. County of Ramsey, 461 F.3d 967, 974 (8th Cir. 2006) (quoting Griffith, 387 F.3d at 736, in turn quoting Thomas, 111 F.3d at 66); accord Twymon, 462 F.3d at 933; cf. Luciano v. Monfort, Inc., 259 F.3d 906, 909 (8th Cir. 2001) (defining direct evidence in a retaliation case as "'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision.'" (quoting Rivers-Frison v. Southeast Mo. Cmty. Treatment Ctr., 133 F.3d 616, 619 (8th Cir. 1998))).  If such evidence is lacking, a plaintiff may still succeed "'by creating the requisite inference of unlawful discrimination through the McDonnell Douglas analysis.'" Arraleh, 461 F.3d at 975 (quoting Griffith, 387 F.3d at 736); accord EEOC v. Trans States Airlines, 462 F.3d at 991 (religion, race, and national origin discrimination); Hannoon, 324 F.3d at 1046 (race and national origin discrimination); Cardenas v. AT&T Corp, 245 F.3d 994, 998 (8th Cir. 2001) (national origin discrimination).

Napreljac focuses entirely on the lack of an interpreter during the investigation leading to his termination and does not point to conduct or statements by Kaufman – the sole decision-maker regarding his termination – suggesting she was motivated by a discriminatory animus.  In fact, Napreljac concedes no such conduct or statements exist.  He thus appears to concede no direct evidence of national origin discrimination exists on the present record.  Therefore, like Napreljac, the Court proceeds to the burden-shifting framework pioneered by the McDonnell Douglas Court.

To succeed under the <u>McDonnell Douglas</u> approach, a plaintiff bringing an employment discrimination claim premised on a violation of Title VII must first establish a <u>prima facie</u> case by showing he (1) is a member of a protected class, (2) was qualified for his position, and (3) suffered an adverse employment action under circumstances permitting an inference that the action was the result of unlawful discrimination.  <u>Johnson v. Ready Mix Concrete Co.</u>, 424 F.3d 806, 810 (8th Cir. 2005); <u>accord</u> <u>Al-Zubaidy v. TEK Indus., Inc.</u>, 406 F.3d 1030, 1037 (8th Cir. 2005) (race, sex, religion, and national origin discrimination); <u>Hannoon</u>, 324 F.3d at 1046 (race and national origin discrimination); <u>Habib v. NationsBank</u>, 279 F.3d 563, 566 (8th Cir. 2001) (race, religion, and nation origin discrimination).[29]  If the record contains fact questions on each element, a rebuttable presumption of discrimination arises.  <u>Al-Zubaidy</u>, 406 F.3d at 1037.  A burden of production emerges upon the employer to state a legitimate and nondiscriminatory reason for the plaintiff's termination.  <u>Johnson v. Ready Mix Concrete Co.</u>, 424 F.3d at 810; <u>Al-Zubaidy</u>, 406 F.3d at 1037; <u>Hannoon</u>, 324 F.3d at 1046; <u>Habib</u>, 279 F.3d at 566; <u>Roxas</u>, 90 F.3d at 316.  If the employer succeeds, a burden of production arises on behalf of the plaintiff to show the proffered reason for the adverse employment action is merely pretext for intentional discrimination.  <u>Johnson v. Ready Mix Concrete Co.</u>, 424 F.3d at 810; <u>Al-Zubaidy</u>, 406 F.3d at 1037; <u>Hannoon</u>, 324 F.3d at 1046; <u>Habib</u>, 279 F.3d at 566; <u>Roxas</u>, 90 F.3d at 316.  As above, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally

---

[29] A common method of proving the third prong is to point to evidence showing similarly-situated employees outside the plaintiff's class were treated differently.  <u>See</u> <u>Twymon</u>, 462 F.3d at 934; <u>Reynolds v. Ethicon Endo-Surgery, Inc.</u>, 454 F.3d 868, 872 (8th Cir. 2006); <u>Richardson v. Sugg</u>, 448 F.3d 1046, 1060 (8th Cir. 2006).  This record provides no such evidence.

discriminated against the plaintiff remains at all times with the plaintiff.'"  <u>Reeves</u>, 530 U.S. at

143 (quoting <u>Burdine</u>, 450 U.S. at 253).

The analysis begins with an assessment of Napreljac's <u>prima facie</u> case.

### 2.   Napreljac's <u>Prima Facie</u> Case.

### a.   Is Napreljac a Member of a Protected Class?

Napreljac must first show he is a member of a protected class.  The parties do not dispute

Napreljac is Bosnian.  Therefore, a fact question exists on this element.  <u>See</u> <u>Hannoon</u>, 324 F.3d

at 1046-47 (holding that evidence showing the plaintiff was a "Middle-Eastern Arab born in

Kuwait" sufficient to satisfy the first prong); <u>El Deeb v. Univ. of Minn.</u>, 60 F.3d 423, 429 (8th

Cir. 1995) (implicitly affirming the conclusion that the plaintiff was a member of a protected

class because he hailed from Egypt); <u>cf.</u> <u>Enowmbitang v. Seagate Tech., Inc.</u>, 148 F.3d 970, 972,

973 (8th Cir. 1998) (inferring an individual from Cameroon is a member of a protected class in a

race and national origin discrimination case).

### b.   Was Napreljac Qualified for His Position?

For the purposes of its motion for summary judgment, JQH concedes Napreljac was

qualified for his position at the time of his termination.  <u>See</u> Def.'s Br. in Supp. of Mot. for

Summ. J. 7.

### c.   Did Napreljac Suffer an Adverse Employment Action Because of His National Origin?

While JQH must concede Napreljac suffered an adverse employment action by virtue of

his termination, JQH argues the record does not contain a genuine issue of material fact with

respect to whether Napreljac was terminated because of his national origin.

JQH opens by noting Napreljac's admissions that he neither heard comments nor was subjected to actions suggesting such discrimination occurred.  Napreljac's testimony is illustrative.

> Q:   Did anybody who was one of your supervisors or managers at the
>       hotel ever say anything to you about your being from Bosnia or about
>       your race that offended you?
> A:   No one said that to me.  We were all okay while I was doing the job.
> . . . .
> Q:   . . . Do you believe the hotel fired you because of your national origin?
> A:   Can I not answer that question?
> Q:   Why don't you want to answer that question
> A:   Just because.

Pl.'s Dep. 84:16-22; 91:9-14, Feb. 8, 2006.  While Napreljac argues JQH treated him differently than it "would treat a similarly situated citizen of the United States," Napreljac has pointed to no facts in the record to support this conclusory allegation.

Napreljac's principal argument is that JQH discriminated against him on the basis of his national origin when Kaufman "decided to discipline/terminate the Plaintiff without the benefit of an interpreter even though it is plainly obvious the Plaintiff only has a rudimentary understanding of the English language."[30]  Apparent from the detailed factual recitation above is a fact question regarding Napreljac's ability to speak English.  Resolution of Napreljac's argument therefore reduces to whether a fact question regarding the extent of Napreljac's mastery of the English language salvages his national origin discrimination claim.

Evidence that JQH could have discriminated against Napreljac because he was not able to speak English is not evidence of national origin-based discrimination.  Language and national

---

[30] Napreljac argues that if "an employer knows of a person's inability to speak the language and intentionally takes advantage of that inability, then such conduct constitutes unlawful discrimination."  This hypothetical is misplaced for two reasons.  First, an adverse employment action does not presumptively follow from an employer's decision to "take advantage" of an employee.  Second, language and national origin are not interchangeable.  See discussion infra at 75-77.

origin are not interchangable.  See Hannoon, 324 F.3d at 1048 (concluding that "criticizing a

foreign employee's facility with the English language" does not "constitute[] discrimination

against a particular race or national origin" (quotation marks omitted)); see also Garcia v. Gloor,

618 F.2d 264, 268 (5th Cir. 1980) ("[Title VII] forbids discrimination in employment on the

basis of national origin.  Neither the statute nor common understanding equates national origin

with the language one chooses to speak."); Brewster v. City of Poughkeepsie, — F. Supp. 2d —,

2006 WL 2535773 (S.D.N.Y. 2006) (holding that Title VII "does not protect against discrim-

ination on the basis of language"); Valasquez v. Goldwater Mem. Hosp., 88 F. Supp. 2d 262

(S.D.N.Y. 2000); Long v. Fist Union Corp. of Va., 894 F. Supp. 2d 933, 941 (E.D. Va. 1995),

aff'd 86 F.3d 1151 (4th Cir. 1996); cf. Olagues v. Russoniello, 770 F.2d 791, 801 (9th Cir. 1985)

(noting that "those courts which have faced the issue [of whether a classification based on an

individual's choice of language is a form of discrimination based on race or national origin] have

held that language-based classifications are not the equivalent of national origin classifications,"

and thus refusing to recognize language-based classification as a suspect class (collecting author-

ities)); Soberal-Perez v. Heckler, 717 F.2d 36, 41 (2d Cir. 1983) (noting in an equal protection

challenge to a governmental practice that "[a] classification is implicitly made, but it is on the

basis of language, i.e., English-speaking verus non-English-speaking individuals, and not on the

basis of race, religion or national origin[; l]anguage, by itself, does not identify members of a

suspect class").[31]  The Fifth Circuit has more fully explained:

---

[31] This case does not present a challenge to an "English only" rule because no such rule
was in place at JQH.  See, e.g., Garcia, 618 F.2d at 268-69; see also 29 C.F.R. § 1616.7(a) (pro-
viding that in the context of "speak-English-only" rules, the "primary language of an individual
is often an essential national origin characteristic," and that "[p]rohibiting employees at all times,
in the workplace, from speaking their primary language or the language they speak most
comfortably, disadvantages an individual's employment opportunities on the basis of

> Save for religion, the discriminations on which [Title VII] focuses its laser of prohibition are those that are either beyond the victim's power to alter, or that impose a burden on an employee on one of the prohibited bases.  No one can change his place of birth (national origin), the place of birth of his forebears (national origin), his race or fundamental sexual characteristics.  As this court said [previously], [e]qual employment opportunity may be secured only when employers are barred from discriminating against employees on the basis of immutable characteristics, such as race and national origin.

Garcia, 618 F.2d at 269 (citations, quotation marks, and footnote omitted).  Language is not an immutable characteristic.

In addition to being supported by legal authority, preventing plaintiffs from swapping national origin and language is intuitive:  many Bosnian-speaking persons have a national origin other than Bosnia, and many non-Bosnian-speaking persons have a Bosnian national origin.  Interchanging national origin and language is a legal and logical error.

The record contains no genuine issue of material fact with regard to whether Napreljac was terminated as a result of his national origin.  JQH is thus entitled to summary judgment on Napreljac's national origin discrimination claim.

---

national origin").
   Additionally, as JQH noted at oral argument, Napreljac has presented no evidence suggesting JQH's business practices give rise to a disparate impact claim because Napreljac has not generated evidence suggesting JQH has a practice of terminating non-English speaking individuals as a way of disguising a broader policy of national origin discrimination.  Cf. Espinoza v. Farah Mfg. Co., 414 U.S. 86, 92 (1973); Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971).
   Finally, while the EEOC classifies discrimination based on "linguistic characteristics" as unlawful until Title VII's prohibition against national origin discrimination, 29 C.F.R. § 1606.1, that provision is applicable where an employee is terminated as a result of a characteristic about the employee's speech, such as an accent.  E.g., Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1194-95 (9th Cir. 2003); Fragante v. City & County of Honolulu, 888 F.2d 591, 595-98 (9th Cir. 1989) (collecting cases); Carino v. Univ. of Okla. Bd. of Regents, 750 F.2d 815, 819 (10th Cir. 1984).  Napreljac does not argue he was terminated because he possessed an accent which did not interfere with JQH's business; he argues he was terminated because he could not understand and communicate in English.

### 3.    Remaining Elements of the Burden-Shifting Analysis.

Neither party addresses the remaining elements of the burden-shifting analysis.

However, if the Court imported the legitimate and nondiscriminatory reason for Napreljac's

termination proffered by JQH in connection with Napreljac's ADA claim and reiterated

Napreljac's response, the Court would be compelled to reach the same conclusion

reached above.

Because the record does not contain a genuine issue of material fact regarding whether

Napreljac's termination was motivated by his national origin, his prima facie case fails.  JQH is

therefore entitled to summary judgment on Napreljac's national origin discrimination claims.

### E.    Napreljac's Discharge in Violation of Public Policy Claim.

The parties each claim entitlement to summary judgment on Napreljac's claim of

discharge in violation of public policy.  The parties do not dispute that Napreljac was an at-will

employee.  Therefore, with few recognized exceptions, his employment was subject to termina-

tion at any time for any lawful reason.  Niblo v. Parr Mfg., Inc., 445 N.W.2d 351, 352 (Iowa

1989); Abrisz v. Pulley Frieght Lines, Inc., 270 N.W.2d 454, 455 (Iowa 1978).  Napreljac claims

his termination violated an exception protecting employees terminated because they filed or are

about to file workers' compensation claims.[32]

---

[32] The other general exception protects terminated employees where a unilateral contract
is created by an employer's handbook or policy manual.  Below v. Skarr, 569 N.W.2d 510, 511
(Iowa 1997); French v. Foods, Inc., 495 N.W.2d 768, 770 (Iowa 1993); Hunter v. Bd. of
Trustees, 481 N.W.2d 510 514-16 (Iowa 1992).  A third exception, discharge in violation of a
covenant of good faith and fair dealing, has not been adopted in Iowa.  Fitzgerald v. Salsbury
Chem., Inc., 613 N.W.2d 275, 281 (Iowa 2001); Borschel v. City of Perry, 512 N.W.2d 565, 566
(Iowa 1994).

### 1.      Basis of the Tort.

Napreljac's pleadings are devoid of the legal basis of his claim, but a fair reading of the cases cited in the parties' briefs suggests Napreljac brings a claim similar to that recognized by the Iowa Supreme Court in Springer v. Weeks & Leo Co. (Springer I), 429 N.W.2d 558 (Iowa 1988).  There, the plaintiff alleged she was terminated from her employment as a result of her pursuit of a workers' compensation claim, concluding this conduct constituted a discharge in violation of public policy.  Id. at 558-59.  Following a workers' compensation claim, the defendant's workers' compensation carrier made a preliminary determination that she suffered a work-related injury and began paying benefits before she was released by her physician to return to work.  Id. at 559.  When the plaintiff returned to work, she was told by her "manager that she could not resume working unless she signed a document stating that her [injuries] were not work-related."  Id.  The plaintiff refused, and was told to obtain a written statement from her physician authorizing her to return to work and certifying her employment would not cause a recurrence of her medical problem.  Id.  She obtained a written statement, but her physician declined to say her work would not cause the injuries to reoccur.  Id.  The plaintiff's employment was then terminated.  Id.

Focusing primarily on the at-will employment status of the plaintiff, an Iowa district court recited the general rule that at-will employees "could be discharged for any reason at all" and entered a directed verdict in favor of the plaintiff's former employer.  Id.  On appeal, the Iowa Supreme Court created a remedy for employees at-will who are terminated for reasons contravening public policy, noting a common scenario occurs "where the cause for discharge is alleged to be the filing of a workers' compensation claim by the employee."  Id. at 560.  The court "believe[d] a cause of action should exist for tortious interference with the contract of

hire[33] when the discharge serves to frustrate a well-recognized and defined public policy of the state."  Id.  The court found such a policy in Iowa Code section 85.18, which provided that "'[n]o contract, rule, or device whatsoever shall operate to relieve the employer, in whole or in part, from any liability created by [chapter 85 of the Iowa Code[34]] except as herein provided.'" Id. (quoting Iowa Code § 85.18 (1987)).  This statute evinced "a clear expression that it is the public policy of [Iowa] that an employee's right to seek the compensation which is granted by law for work-related injuries should not be interfered with regardless of the terms of the contract of hire."  Id. at 560-61.  Permitting the discharge of a plaintiff seeking benefits would undercut that policy, whereas permitting remedies for such discharges "act[ed] to advance a legislatively declared goal."  Id. at 561.  In light of this rule, the Iowa Supreme Court concluded a directed verdict in favor of the defendant was improper.  Id. at 562.

　　The court has since refined the doctrine, see Harvey v. Care Initiatives, Inc., 634 N.W.2d 681, 684-86 (Iowa 2001) (refusing to extend Springer I to protect independent contractors discharged for filing a complaint against the party with which its contract exists); Below v. Skarr, 569 N.W.2d 510, 511-12 (Iowa 1997) (refusing to expand Springer I to permit recovery where an employee is harassed and termination is threatened but the employee retains his employment and receives workers' compensation benefits); Smith v. Smithway Motor Xpress,

---

　　[33] Rejecting the contention that the legislature should have the first opportunity to create the tort, the court noted its new cause of action was more closely related to the tort of "improper interference with existing business relationships than with any single substantive topic with which the legislature might deal."  Springer I, 429 N.W.2d at 561.  On Springer's second appeal, the court wrote that its prior reference to the cause of action as "tortious interference with a contract for hire" generated unnecessary confusion because a wrongful discharge claim does not require evidence of tortious interference.  See Springer v. Weeks & Leo Co. (Springer II), 475 N.W.2d 630, 633 (Iowa 1997).

　　[34] Chapter 85 of the Iowa Code sets forth workers' compensation statutes.

Inc., 464 N.W.2d 682, 685 (Iowa 1990) (extending Springer I to hold that an employer can be held liable "even if the employer does not interfere with the discharged employee's benefits"); see generally Fitzgerald, 613 N.W.2d at 281-82 (cataloging public policies chilled in the absence of the tort of discharge in violation of public policy), but has maintained the core purpose of the tort is to prevent the Hobson's choice[35] facing employees forced to decide between remaining employed or seeking workers' compensation claims, see Harvey, 634 N.W.2d at 683 ("No employee should face the dilemma of giving in to improper threats by employers or be subject to discharge without a remedy."); accord Below, 569 N.W.2d at 512; Smith v. Smithway Motor Xpress, Inc., 464 N.W.2d at 686. Notably, the public policy protecting the pursuit of workers' compensation benefits is not implicated (eliminating the choice between benefits and employment) when an employee is terminated for missing work following a work-related injury. See Yockey v. Iowa, 540 N.W.2d 418, 420-21 (Iowa 1995).

### 2. Elements of the Tort.

The above discussion leads to the elements Napreljac must prove to succeed. A plaintiff contending his termination was in violation of public policy must establish (1) engagement in a protected activity, (2) an adverse employment action, and (3) a causal connection between the conduct and the adverse employment action. Fitzgerald, 613 N.W.2d at 281; Teachout v. Forest City Cmty. Sch. Dist., 584 N.W.2d 296, 299 (Iowa 1998); see Springer II, 475 N.W.2d at 633 (approving a jury instruction with five elements substantially similar to the test outlined above);

---

[35] Thomas Hobson, an English letter carrier, occasionally rented to attendees of a nearby college horses from his livery stable otherwise used to carry mail. Because his best horses were overworked as a result of their popularity, he devised a rotation system wherein potential customers were permitted to rent only the next horse in line. His "this one or none" policy was an apparent choice with no choice at all.

see also Melvin v. Car-Freshener Corp., 453 F.3d 1000, 1002 (8th Cir. 2006) (applying Iowa law) (2-1 decision); Webner, 267 F.3d at 835 (applying Iowa law); Barrera v. Con Agra, Inc., 244 F.3d 663, 665 (8th Cir. 2001) (same); Poage v. Cenex/Land O' Lakes Agronomy Co., 255 F. Supp. 2d 1005, 1009 (S.D. Iowa 2003) (same); Coleman v. Swift & Co., 88 F. Supp. 2d 966, 971 (S.D. Iowa 1999) (same); Beal v. Rubbermaid Commercial Prods., Inc., 972 F. Supp. 1216, 1229 (S.D. Iowa 1997) (same).  Seeking workers' compensation benefits qualifies as a protected activity shielded by a clear and well-recognized public policy of the state of Iowa.  See Springer I, 429 N.W.2d at 560-62.  In fact, it is unnecessary that the plaintiff ever file a claim; if the termination interferes with the right to file a claim, the termination is still wrongful.  See Niblo, 445 N.W.2d at 353.

This court noted three years ago that "Iowa courts have not specifically addressed the question of whether a burden-shifting analysis applies if Plaintiff overcomes his burden of establishing the prima facie case [on retaliatory discharge claims], but Iowa case law indicates such an analysis applies."  Poage, 255 F. Supp. 2d at 1009 (citing Knutson v. AG Processing, Inc., No. C01-3015-MWB, 2002 WL 31422858 (N.D. Iowa 2002)).  Under this test, a plaintiff bears the burden of establishing a prima facie case of retaliation.  Id.  If the plaintiff succeeds, a presumption of retaliation arises which a defendant can rebut by pointing to a legitimate, nondiscriminatory reason for the adverse employment action.  Id.  If the defendant succeeds, the burden returns to the plaintiff to demonstrate the proffered reason is a pretext for otherwise unlawful action.  Id.

3.    **Analysis.**

a.    **Napreljac's <u>Prima</u> <u>Facie</u> Case.**

JQH claims Napreljac's claim fails because he has not generated a fact question on causation – the third element of his <u>prima</u> <u>facie</u> case.  And although Napreljac has also moved for summary judgment on this claim, JQH resists Napreljac's argument on causation only.  As a result, the analysis focuses there.

"The causation standard in a common-law retaliatory discharge case is high."  <u>Teachout</u>, 584 N.W.2d at 299 (citing <u>Hulme v. Barrett</u>, 480 N.W.2d 40, 42 (Iowa 1992)); <u>accord</u> <u>Melvin</u>, 453 F.3d at 1002; <u>Barrera</u>, 244 F.3d at 665; <u>Coleman</u>, 88 F. Supp. 2d at 973; <u>Fitzgerald</u>, 613 N.W.2d at 289.  A plaintiff must show "[t]he employee's engagement in protected conduct [was] the <u>determinative</u> factor in the employer's decision to take adverse action against the employee."  <u>Teachout</u>, 584 N.W.2d at 301; <u>accord</u> <u>Melvin</u>, 453 F.3d at 1002; <u>Barrera</u>, 244 F.3d at 665; <u>Coleman</u>, 88 F. Supp. 2d at 973; <u>Fitzgerald</u>, 613 N.W.2d at 289.  A "predominant" factor is different from a "determinative" factor:

> A purpose is predominant if it is the primary consideration in making a decision; while other reasons may exist, they are less influential than the predominant purpose.  A "determinative factor," on the other hand, need not be the main reason behind the decision.  It need only be the reason which tips the scales decisively one way or the other.

<u>Smith v. Smithway Motor Xpress, Inc.</u>, 464 N.W.2d at 686; <u>see also</u> <u>Teachout</u>, 584 N.W.2d at 302 & n.2 (rejecting a rule mandating that protected conduct "be 'the determining or predominant factor' in the employer's decision to take adverse action," holding that the proper standard requires only that "the protected conduct must be the determining factor, not the predominant factor" (reversing <u>Butts v. Univ. of Osteopathic Med. & Health Sciences</u>, 561 N.W.2d 838, 842 (Iowa Ct. App. 1997)); <u>see generally</u> <u>Smith v. Smithway Motor Xpress, Inc.</u>, 464 N.W.2d at 686

("If retaliation is allowed to weigh at all in the employer's decision to discharge, there will be a chilling effect on employees entitled to claim benefits.  This would clearly conflict with . . . public policy . . . .").  Put another way, "it must appear that the discharge was prompted by the filing of the workers' compensation claim."  <u>Sanford v. Meadow Gold Dairies, Inc.</u>, 534 N.W.2d 410, 412 (Iowa 1995).

JQH argues Napreljac has not pointed to comments made or actions taken by JQH suggesting his termination was precipitated by past or future workers' compensation claims.  Instead, JQH argues that despite Napreljac's past injuries, JQH continued employ him and worked with Napreljac to find jobs for him in light of his varying restrictions.

Napreljac's resistance is unclear.  The "essence" of his argument is that

> the Defendant saw the Plaintiff as making a workers' compensation claim due to the occurrence of September 18, 2003, and continuing on his claims from 2001 and August 2003, and decided to fabricate a false incident report to justify terminating the Plaintiff to the unemployment commissioner and to discredit the Plaintiff's potential workers' compensation claims and to rid itself of an employee who is making claims of on-the-job injuries.

Pl.'s Br. in Support of Pl.'s Resistance to Def.'s Mot. to Dismiss & Summ. J., at 49-50.  He argues that when JQH, concerned with the Holi-Care program, faced with "what it sees [sic] as another worker compensation claim on . . . September 18, 2003, . . . decide[d] to end this by terminating Plaintiff for having falsely made a worker compensation claim report."

Untangling this line of reasoning requires some effort, but tugging at its edges causes the argument to unravel.  Because the record is viewed favorably to Napreljac at this phase, the Court grants him the benefit of three favorable versions of his argument.  The first way to inter- pret Napreljac's argument requires it to rest on the assumption that JQH prepared a false injury report form and then terminated him for that reason.  If JQH terminated Napreljac for preparing a

false report with knowledge it was false, Napreljac could not have been terminated for filing or for being about to file a workers' compensation claim because if the claim was false, there would be no workers' compensation benefits to seek.

Alternatively, Napreljac could be asserting that JQH thought Napreljac was about to file a claim as a result of his September 18 injury, and this, coupled with previous claims, led to his termination for making too many claims.  First addressing Napreljac's previous claims, the record shows each time Napreljac arrived at work with physical restrictions, JQH did not discourage him from seeking future workers' compensation benefits, but adjusted his job responsibilities to fit those restrictions and helped him complete his work.  See Fogel v. Trustees of Iowa College, 446 N.W.2d 451, 454-55 (Iowa 1989) (affirming summary judgment on retaliatory discharge claim when the plaintiff performed his job duties until the time of his termination and no previous injuries sustained by the plaintiff "gave rise to any complaint by his supervisors that he should not file medical insurance or workers' compensation claims").  Additionally, the record does not show "concern" with the performance of the Holi-Care program; the record shows the program went unperformed with little concern when Napreljac was unable to do that part of his job.  And while the record does show Napreljac represented to Johnston and Beaver that certain parts of his work were too difficult at times, the record also shows JQH found other work for Napreljac to do while he was under those restrictions.  Consequently, the record shows no connection between Napreljac's previous workers' compensation claims and his termination.

While the temporal proximity of his September 18 injury to his termination weighs in Napreljac's favor, that fact alone is insufficient.  See Webner, 267 F.3d at 835-36 (termination four days after an event giving notice that a claim could be impending "standing alone is insuffi-

cient to support a retaliatory discharge claim").  In every case where summary judgment has been denied on variants of this argument, plaintiffs have presented something more than evidence of a close temporal proximity between the event giving rise to the claim (or the claim itself) and the termination.  See Coleman, 88 F. Supp. 2d at 973 ("In each case in which the Iowa Supreme Court has found sufficient evidence of causation 'there was evidence showing a causal connection in addition to the timing of the adverse employment action.'" (quoting Teachout, 584 N.W.2d at 302)); see also Barrera, 244 F.3d at 665-66 (affirming grant of summary judgment where "other than the timing of the discharge, [the plaintiff] produced 'almost no evidence' that his termination was in any way related to his worker's compensation claim"); Coleman, 88 F. Supp. 2d at 973 (insufficient evidence of causation where "nothing connecting the discharge to his [complaint] . . . other than the temporal relationship between the two events").  Even if termination occurs the same day as the report of a workplace injury, courts have relied on other evidence to deny summary judgment.  E.g., Hansen v. Sioux By-Products, 988 F. Supp. 1255, 1268-69 (N.D. Iowa 1997).  Other than the argument that JQH falsified a workers' compensation claim form which it then used to terminate Napreljac, which is untenable for the reasons explained above, this permutation of Napreljac's argument rests on nothing but timing.

A third way to interpret Napreljac's argument is that JQH intentionally exaggerated the scope of the injury he reported to provide a factual basis for terminating him for falsifying a company document.  Interpreting his argument this way permits Napreljac to still have had a valid workers' compensation claim to pursue and permits the version of events relayed to Kaufman by JQH employees later encapsulated in the notice of termination giving the reasons for Napreljac's termination to be false.  Under this scenario, Napreljac claims he was forced to choose to forgo a potential claim or to report his injury with the risk of facing termination if his

employer falsified information regarding the report.  Cf. Harvey, 634 N.W.2d at 683; Below, 569 N.W.2d at 512; Smith v. Smithway Motor Xpress, Inc., 464 N.W.2d at 686.  Napreljac claims this evidence provides a link between his potential pursuit of workers' compensation benefits and his termination.

While trapping an employee in the binary of filing a workers' compensation claim or retaining employment is the very choice this tort is designed to prevent, see, e.g., Springer I, 429 N.W.2d at 559-62, Napreljac has not provided record evidence that this situation arose.  The record shows that on September 18, 2003, Napreljac reported the incident on the loading dock to Johnston and Beaver and went about his work.  He was no more dissuaded from making a claim on that date than he had been on previous occasions.  Further, even if JQH employees thought Napreljac's reports of his injury were false or exaggerated, and terminated him on that basis, that fact does not aid Napreljac.  The tort is not designed to protect employees making false claims or false representations during investigations into workplace accidents: it is designed to protect employees who would be discouraged from reporting a workplace accident.

Napreljac next claims a link between a potential workers' compensation claim and his termination is established by Kaufman's testimony and the notice of termination form documenting the reasons for Napreljac's discharge.  According to Napreljac, because JQH terminated him for falsifying a company document when he did not, the requisite casual connection is established.

Viewing the record favorably to Napreljac requires the assumption that neither the signature on nor the statements in the accident report form are his.  However, JQH has other evidence supporting its conclusion that Napreljac was untruthful.  The testimony of Beaver and Postier, coupled with Beaver's memorandum, indicates a belief that Napreljac reported and demonstrated he had fallen, a representation Kaufman believed to be false.  Schmeling's testimony shows

87

Napreljac had represented he was picking up trash when he was injured, statements Kaufman concluded were false.  Kaufman memorialized these conclusions in a form shown to Napreljac when he was terminated.

At bottom, JQH's conclusion that Napreljac made false misrepresentations as part of the investigation following his September 18 incident does not prove the reason for his termination was to bar or interfere with his pursuit of workers' compensation benefits, or that his previous claims coupled with any potential claim arising from his September 18 injury was the tipping point leading to his termination.  This conclusion does not require the weighing of evidence, for Napreljac has pointed to no statements uttered or conduct undertaken suggesting his termination was connected in any way to his past or future workers' compensation claims.  Cf. Clarey v. K-Products, Inc., 514 N.W.2d 900, 902 (Iowa 1994) (upholding jury verdict in favor of plaintiff where "[t]he plaintiff submitted evidence of tardy payment of workers' compensation benefits by [her former employer], disparaging comments by company officials concerning claims for workers' compensation, and the testimony of several employees that they had been harassed following their filing of workers' compensation claims," as well as evidence that the plaintiff's former employer "gave inconsistent reasons for her discharge" and "testimony by the company's doctor that he believed the company was intentionally 'slowing things down' in processing workers' compensation claims"); Niblo, 445 N.W.2d at 353 (affirming denial of defendant's motion for directed verdict where the plaintiff's supervisor told her that her employer "was not going to pay for her to go to a doctor"; after seeing a dermatologist anyway, the plaintiff told the company president her condition was work-related and that she required goggles, protective cream, and continued treatment, but the president told the plaintiff "he was not going to pay

workmen's compensation or unemployment benefits," that he did not believe her condition was work-related, and then terminated her).

Recalling that success on a retaliatory discharge claim has a high standard of proof that interference with workers' compensation benefits was the determinative factor in the decision to take the adverse employment action, see Melvin, 453 F.3d at 1002; Barrera, 244 F.3d at 665; Coleman, 88 F. Supp. 2d at 973; Fitzgerald, 613 N.W.2d at 289; Teachout, 584 N.W.2d at 299-302; Smith v. Smithway Motor Xpress, Inc., 464 N.W.2d at 686, the Court must conclude the record contains no genuine issue of material fact with respect to the causation element of Napreljac's prima facie case.[36]

### b.   JQH's Identification of a Legitimate, Nondiscriminatory Reason for Napreljac's Discharge.

Assuming Napreljac could generate a fact question on each element of his prima facie case, JQH has pointed to a legitimate, nondiscriminatory reason for his termination.  The identified reasons for Napreljac's termination are identical to those identified with his disability discrimination claim discussed above.  The Court concludes, as above, that discharging an employee for violating a company policy or making material misrepresentations during an investigation into a workplace injury are legitimate reasons for discharge independent of an unlawful animus on the part of the employer.  Further, the stated reasons for his discharge are not in themselves violative of a clearly identified public policy.

_____

[36] Napreljac's reliance on a "downgrade[ in] his performance evaluations after [his] workers' compensation claim" creates no material issue for two reasons.  First, the "downgrade" occurred more than one year before his termination.  Second, poor performance was not the proffered reason for Napreljac's discharge.

### c. Napreljac's Attempt to Show JQH's Purported Legitimate, Nondiscriminatory Reason is Pretext.

Turning to the third prong of the burden-shifting analysis, Napreljac contends JQH's proffered reason for his termination is a pretext for a retaliatory motive.  He argues that to recognize JQH's reason for terminating Napreljac as legitimate and nondiscriminatory would permit employers to "fire an employee for reporting a worker compensation injury and still be exempt from a retaliatory discharge claim."  This argument appears to be based on the same evidence offered to show a causal connection between workers' compensation claims for which Napreljac was eligible and his termination.

By relying on the same evidence, Napreljac ignores the requirement that an attempt to show a proffered reason for the termination is pretext must be viewed in light of the reason offered for the adverse employment action.  Cf. Logan, 416 F.3d at 881-82; Smith v. Allen Health Sys., Inc., 302 F.3d at 833-34.  While a "strong" prima facie case can serve to establish pretext, Napreljac's prima facie case is not strong; it is defective.

The Court concludes JQH is entitled to summary judgment on Napreljac's discharge in violation of public policy claim.  Because this conclusion is reached viewing the record favorably to Napreljac, it follows that Napreljac's motion for summary judgment on the same count must be denied.

### F. Napreljac's Intentional Infliction of Emotional Distress Claim.

Finally, JQH claims entitlement to summary judgment on Napreljac's intentional infliction of emotional distress claim.  JQH argues this claim is preempted by the ICRA, and to the extent it is not, the record is insufficient to create a fact question on any element Napreljac must prove to succeed.

1.    **Preemption.**

a.    **Preemptive Nature of the ICRA.**

The Iowa Civil Rights Act makes it an "unfair or discriminatory practice" for a "[p]erson to . . . discharge any employee, or to otherwise discriminate in employment against . . . any employee . . . because of the . . . race . . . national origin . . ., or disability of such . . . employee, unless based upon the nature of the occupation."  Iowa Code § 216.6(1)(a).  "To the extent the ICRA provides a remedy for a particular discriminatory practice, its procedure is exclusive and the claimant asserting that practice must pursue the remedy it affords."  Smidt v. Porter, 695 N.W.2d 9, 17 (Iowa 2005); accord Channon v. United Parcel Serv., Inc., 629 N.W.2d 835, 858 (Iowa 2001); Borschel, 512 N.W.2d at 567-68; Greenland v. Fairtron Corp., 500 N.W.2d 36, 38 (Iowa 1993); Grahek v. Voluntary Hosp. Coop. Ass'n of Iowa, Inc., 473 N.W.2d 31, 33 (Iowa 1991); Vaughn v. Ag Processing, Inc., 459 N.W.2d 627, 638 (Iowa 1990); Hamilton v. First Baptist Elderly Hous. Found., 436 N.W.2d 336, 341-42 (Iowa 1989); Northrup v. Farmland Indus., Inc., 372 N.W.2d 193, 197 (Iowa 1985).  Intentional infliction of emotional distress claims are susceptible to preemption where a plaintiff also brings an ICRA wrongful termination claim.  E.g., Channon, 629 N.W.2d at 858; Greenland, 500 N.W.2d at 38.  But see Grimm v. US West Commc'ns, Inc., 644 N.W.2d 8, 16-17 (Iowa 2002) (preemption improper, particularly in the context of a motion to dismiss, where the plaintiff's intentional infliction of emotional distress claim was not disguised as a sexual-orientation discrimination claim).

To decide whether a tort claim is preempted, the Court must examine whether "'in light of the pleadings, discrimination is made an element of' the [tort] claim."  Smidt, 695 N.W.2d at 17 (quoting Channon, 629 N.W.2d at 857); accord Greenland, 500 N.W.2d at 38.  That is, "[i]f, under the facts of the case, success on the non-ICRA claims requires proof of discrimination"

because the two claims rely on common operative facts, the non-ICRA claims cannot proceed. Channon, 629 N.W.2d at 857 (citing Greenland, 500 N.W.2d at 38); see also Borschel, 512 N.W.2d at 567-68 ("Our civil rights statute, however, preempts an employee's claim that was in violation of public policy when the claim is premised on discriminatory acts."). Those "'separate and independent, and therefore incidental, causes of action'" survive. Smidt, 695 N.W.2d at 17 (quoting Channon, 629 N.W.2d at 857).

Preemption most frequently occurs if a plaintiff brings a tort claim supported by factual allegations which can be swept into conduct the ICRA prohibits. E.g., Smidt, 695 N.W.2d at 17 (affirming court's refusal to permit plaintiff to amend her petition to include a wrongful discharge claim when the proposed tort claim alleged her termination arose from "repeated inquiries about and requests for maternity leave" and an existing ICRA claim was based on allegations that her termination arose out of her "pregnancy, and in retaliation for her voiced concerns about maternity leave"); Greenland, 500 N.W.2d at 38 (preemption of intentional infliction of emotional distress claim proper where "[d]iscrimination through sexual harassment is the 'outrageous conduct'" supporting the tort claim); Grahek, 473 N.W.2d at 34-35 (wrongful termination claim preempted where a plaintiff "essentially urge[d] that [he] was discharged because of his age," allegations "indistinguishable from the [plaintiff's] civil rights claim"); Hamilton, 436 N.W.2d at 341-42 (preemption appropriate where a tort claim "boil[ed] down to an assertion of sex discrimination"); Northrup, 372 N.W.2d at 196-97 (discharge in violation of public policy claim preempted where the plaintiff alleged he was discharged because he was an alcoholic, a claim remediable under the ICRA).

Key to the analysis is how a plaintiff's tort claim is cast in the pleadings. See Smidt, 695 N.W.2d at 16-17; Channon, 629 N.W.2d at 857; Greenland, 500 N.W.2d at 38. Thus, the

analysis turns on whether, by virtue of the way Napreljac has pursued his intentional infliction of emotional distress claim, he has made discrimination an element of his tort claim.

### b.    Comparison of Napreljac's Tort Claim to Napreljac's ICRA Claims.

Beginning with Napreljac's ICRA claims, he alleges JQH discriminated against him on the basis of his national origin, race, and disability.  Compl. ¶ 11(b), (d)-(e).  Regarding his intentional infliction of emotional distress claim, Napreljac's pleadings simply allege that "[t]he Defendants [sic] have intentionally inflicted emotional distress upon the Plaintiff."  Id. ¶ 11(f). Napreljac has since further developed the factual underpinnings of his tort claim, arguing JQH's employees "intentionally falsified a report about a work incident and then attempted to cajole [Napreljac] into signing" it.  He claims he was "sent . . . to the doctor with hope that the doctor would contradict his story" about his injuries.  While he was being treated, JQH allegedly "built a case against him and then summarily suspended him from his employment for falsifying a record he neither wrote nor signed."

JQH has provided little by way of argument regarding why it believes Napreljac's intentional infliction of emotional distress claim is preempted.  Indeed, each of the factual bases identified by Napreljac to support his tort claim do not appear to require discrimination based on his national origin, race, or alleged disability.

The Court concludes Napreljac's intentional infliction of emotional distress claim is not preempted by the ICRA.

### 2.     Merits of Napreljac's Intentional Infliction of Emotional Distress Claim.

Because JQH has moved for summary judgment on the merits of his claim as well, Napreljac must do more than demonstrate that the factual bases supporting his tort claim are distinct from those supporting his ICRA claim; he must generate a fact question on each element of the tort.

It is well established that a plaintiff must prove the following elements to succeed on an intentional infliction of emotional distress claim under Iowa law:  "'(1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.'"  Barreca v. Nickolas, 683 N.W.2d 111, 123 (Iowa 2004) (quoting Fuller v. Local Union No. 106, 567 N.W.2d 419, 423 (Iowa 1997)); accord Ette ex rel. Ette v. Linn-Mar Cmty. Sch. Dist., 656 N.W.2d 62, 70 (Iowa 2002); Ollinger v. Bennett, 562 N.W.2d 167, 172-73 (Iowa 1997) (collecting cases); Taggart v. Drake Univ., 549 N.W.2d 796, 802 (Iowa 1996); Steckelberg v. Randolph, 448 N.W.2d 458, 461 (Iowa 1989); Northrup, 372 N.W.2d at 197; Amsden v. Grinnell Mut. Reinsurance Co., 203 N.W.2d 252, 255 (Iowa 1972); see also Iowa Civ. Jury Instruction 2000.1 (1993) (collecting cases); Restatement (Second) of Torts § 46(1) (1965). With respect to the first element, a plaintiff must present substantial evidence of outrageous conduct.  Fuller, 567 N.W.2d at 423; Vaughn, 459 N.W.2d at 636.  In cases of this type, "'it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous.'"  Cutler v. Klass, Whicher & Mishne, 473 N.W.2d 178, 183 (Iowa 1991) (quoting M.H. ex rel. Callahan v. Iowa, 385 N.W.2d 533, 540

(Iowa 1986)); accord Northrup, 372 N.W.2d at 198; Vinson v. Linn-Mar Comty. Sch. Dist., 360 N.W.2d 108, 118 (Iowa 1984).

Although JQH facially argues Napreljac cannot generate a fact question on any element, it focuses on a claimed lack of evidentiary support for Napreljac's claim that conduct of JQH employees was outrageous.  JQH argues the actions alleged by Napreljac, even if they occurred, do not rise to the level of outrageousness required to recover.  Napreljac claims JQH's employees falsified an injury report used to terminate his employment and also sent him to a physician hoping the physician would contradict Napreljac's version of events.  Since this is JQH's motion, these facts are viewed in a light favorable to Napreljac.

Beginning with the latter allegation, there is no evidence of attempts by JQH to contact Dr. Minervini before Napreljac's visit to persuade Dr. Minervini to manufacture medical records contradicting Napreljac's story.  Merely "hop[ing]" his records would be inconsistent with Napreljac's version of events is not conduct intended or likely to lead to emotional distress on the part of Napreljac.  In fact, "hop[ing]" is arguably not intentional conduct at all.  Consequently, this allegation does little to aid Napreljac's claim.

The allegedly false injury report requires a closer discussion.  The Iowa Supreme Court has made clear that the bar for outrageous conduct is high, writing that "[o]utrageous conduct" is that conduct "'so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  Northrup, 372 N.W.2d at 198 (quoting Vinson, 360 N.W.2d at 118; accord Ette, 656 N.W.2d at 70-71; Clark-Peterson Co. v. Indep. Ins. Assocs., Ltd., 514 N.W.2d 912, 916 (Iowa 1994); Engstrom v. Iowa, 461 N.W.2d 309, 320 (Iowa 1990); Harsha v. State Sav. Bank, 346 N.W.2d 791, 801 (Iowa 1984);

Meyer v. Nottger, 241 N.W.2d 911, 918 (Iowa 1976).  The test articulated in the Restatement

(Second) of Torts guides the analysis:

> It has not been enough that the defendant has acted with an intent which is
> tortious or even criminal, or that he has intended to inflict emotional
> distress, or even that his conduct has been characterized by "malice," or a
> degree of aggravation which would entitle the plaintiff to punitive damages
> for another tort. . . . .  Generally the case is one in which the recitation of the
> facts to an average member of the community would arouse his resentment
> against the actor, and lead him to exclaim "Outrageous!"

Restatement (Second) of Torts § 46, cmt. *d*, quoted in Northrup, 372 N.W.2d at 198, Van Baale

v. City of Des Moines, 550 N.W.2d 153, 156-57 (Iowa 1996), and Roalson v. Chaney, 334

N.W.2d 754, 756 (Iowa 1983); see also Restatement (Second) of Torts § 46 cmt. *f* ("major

outrage" required)

The reason for such a high bar "can be understood by reference to the policies underlying

the action:"

> On the one hand, few would suggest the courts should open wide the door to
> fictitious claims and to the resolution of trivialities or mere bad manners.
> The tort law should encourage a certain level of emotional toughness.  "The
> rough edges of our society are still in need of a good deal of filing down,
> and in the meantime plaintiffs must necessarily be expected and required to
> be hardened to a certain amount of rough language, and to occasional acts
> that are definitely inconsiderate and unkind. . . ."
>
> On the other hand, where conduct exceeds that which a reasonable person
> could be expected to endure and serious emotional injury results, there
> clearly exists an interest in allowing recovery, both to compensate the
> victim and to delineate the boundaries of permissible activity.

Meyer, 241 N.W.2d at 981 (quoting Restatement (Second) of Torts § 46 cmt. *d*; citations and

quotation marks omitted); see also Van Baale, 550 N.W.2d at 156 (requiring conduct that is

"extremely egregious; mere insult, bad manners, or hurt feelings are insufficient"); Tomash v.

John Deere Indus. Equip. Co., 399 N.W.2d 387, 392-93 (Iowa 1987) (classifying the standard of

outrageousness as "stringent"); cf. Niblo, 445 N.W.2d at 357 (noting intentional infliction of emotional distress claims require a greater level of proof than those where emotional distress arises from a wrongful discharge because "the law will not intervene in every case where someone's feelings are hurt or where the mental distress is not severe").

When deciding whether conduct is outrageous, "the court should consider the relationship between the parties:  'The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.'"  Vinson, 360 N.W.2d at 118 (quoting Restatement (Second) of Torts § 46, cmt. e). Thus, "[a]n employer . . . has a duty to refrain from abusive behavior toward employees." Id. (citing Hall v. May Dep't Stores Co., 637 P.2d 126, 131 (Or. 1981); see also Taggart, 549 N.W.2d at 802 (finding threatening behavior by an individual with supervisory authority over the plaintiff a factor in the plaintiff's favor).

Even in light of the employer-employee relationship present here, two analogous cases demonstrate why the facts Napreljac has identified are insufficiently outrageous.  In Northrup v. Farmland Industries, Inc., the plaintiff claimed his former employer's conduct was outrageous because the plaintiff was terminated for being an alcoholic.  Northrup, 372 N.W.2d at 198.  The plaintiff also alleged his "supervisor 'yelled' at him, told him he would not tolerate any more of [the plaintiff]'s behavior, suggested that he had falsified some 'documents' and accused him of lying." Id.  The supervisor "criticized" the plaintiff's work and "told him that he was 'fed up' with him." Id.

Noting "a reasonable level of tolerance" and "certain level of emotional toughness" is required of any employee, the court held that the general criticism incurred by the plaintiff was nothing "unusual in an employer-employee relationship." Id. at 198-99 (quotation marks

omitted).  The court articulated that while allegations of falsifying documents and lying "appear[ed] to be more serious than the general allegations of friction" often accompanying any workplace relationship, the conduct was not outrageous.  Id. at 199.  There, the plaintiff claimed he did not know whether any falsified documents actually existed, did not inquire as to their existence, and did not claim that statements he was accused of making were untrue.  See id.

Here, assuming the signature on the accident report form is not Napreljac's, the record shows Napreljac does not dispute the truth of the statements it contains.  The accident report form lists the "employee description of accident" as "walking down the steps picking up garbage," and indicates Napreljac was "picking litter on steps [and] stepped wrong."  Napreljac has previously testified that he remembered telling Dr. Minervini that he "was walking down some steps and hurt [his] back," and that while he was "going down steps and picking up garbage with a stick, he stepped with R foot and felt extreme pain in R mid low back radiating to both legs."  What Napreljac appears to deny is that he "fell" or "slipped;" but that language does not appear on the accident report form.  Consequently, that form cannot constitute the type of falsified document which would make JQH's conduct outrageous enough to support an intentional infliction of emotional distress claim.

Even assuming Napreljac was fired for dishonesty when he had not been dishonest, his claim still fails.  In Vinson v. Linn-Mar Community School District, the plaintiff, a former school bus driver, alleged she was subjected to systematic harassment by her supervisor which included her supervisor conducting a study of her route and requiring her to report a theoretical route time on her time cards even though it did not affect her pay and despite prior practice to the contrary; accusing her of falsifying time records even though the plaintiff's supervisors were aware that her time had been accurately reported; and discharging her for dishonesty and

98

representing to a prospective employer her termination was for dishonesty.  <u>Vinson</u>, 360 N.W.2d

at 119.  The court concluded that even though "a jury could find defendants engaged in a

deliberate campaign to badger and harass plaintiff, . . . their conduct [did not] rise[] to the level

of extremity essential to support a finding of outrageousness." <u>Id.</u> at 119.  While a jury could

conclude that the "defendants' actions were petty and wrong, even malicious, [the court did] not

believe a trier of fact could reasonably conclude that the conduct went beyond all possible

bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized

community." <u>Id.</u>

    Applied here, <u>Vinson</u> reveals that even if the information in the accident report form was

both false and manufactured by JQH employees and Kaufman was aware of that fact but termi-

nated Napreljac anyway, that conduct is not sufficiently outrageous to generate a fact question

on Napreljac's intentional infliction of emotional distress claim.  While such conduct is certainly

reprehensible, it is not the kind of outrageousness needed to succeed.  <u>Compare</u> <u>Van Baale</u>, 550

N.W.2d at 154-57 (finding insufficient evidence of outrageous conduct when the plaintiff, a

police officer, was terminated after pleading guilty to obstruction of justice and pleading <u>nolo</u>

<u>contendere</u> to and being subsequently convicted of domestic abuse, but claimed his termination

was disproportionately harsh and violated a "guarantee" from the city's police chief that if he

pled guilty, skirting negative publicity for the police department, the plaintiff would receive a

suspension); <u>Taggart</u>, 549 N.W.2d at 802 (deciding a supervisor losing his temper, "yelling at

[the plaintiff] in a sexist and condescending manner, referr[ing] to [the plaintiff] as a 'young

woman,' and accus[ing the plaintiff] of causing trouble and 'making [the supervisor's] life

difficult" coupled with the supervisor getting "up out of his chair and leaning over the table

glaring at [the plaintiff] in a threatening manner" was insufficient evidence of outrageous con-

duct); <u>Dickerson v. Mertz</u>, 547 N.W.2d 208, 214 (Iowa 1996) (concluding plaintiff had not shown outrageous conduct on claims against conservation peace officers who "issued plaintiff two citations of which he was acquitted," "confiscated and refused to return to plaintiff an invalid hunting license," "checked plaintiff's game licenses on eight to ten occasions in a rude manner, and . . . refused to let plaintiff keep a road-killed deer to which plaintiff had no legal title"); <u>Cutler</u>, 473 N.W.2d at 179-80, 183-84 (letter sent from law partnership to lawyer denying his request to return to work on a part-time basis after a time of disability leave which arguably led to his suicide deemed not outrageous even though the letter was sent at a time when the lawyer's partners were aware of the decedent was represented by counsel and was in a fragile mental state); <u>Engstrom</u>, 461 N.W.2d at 320 (conduct of state social workers insufficiently outrageous in claims advanced by preadoptive parents where social workers negligently failed to investigate natural mother's claims that natural father had died despite suspicions the natural mother and her male companion "might be lying"); <u>Harsha</u>, 346 N.W.2d at 801 (concluding that intentionally breaching a contract through an agent is "not condone[d]" but does not rise to the level of outrageousness required); <u>and Fuller</u>, 567 N.W.2d at 421, 422-43 (filing a false police report causing a subsequent traffic stop "[i]n no way . . . qualif[ies]" as outrageous); <u>with Wambsgans v. Price</u>, 274 N.W.2d 362, 366 (Iowa 1979) (holding that "there was evidence to support" a finding of intentional infliction of emotional distress upon proof that inattentiveness on the part of a real estate agent brought financial ruin upon the plaintiffs), <u>and Meyer</u>, 241 N.W.2d at 914-19 (finding fact questions existed on a plaintiff's claim where the defendant funeral home owner misrepresented the condition of the plaintiff's father's corpse, represented certain optional caskets were mandatory, and interfered with other funeral arrangements).

This Court is compelled to follow the clear thrust of this increasing and consistent body of law defining outrageous conduct in the context of this tort.  Thus, even extending Napreljac a favorable reading of the record, he has not generated a fact question on the issue of whether the actions of JQH's agents were outrageous.  Consequently, JQH is entitled to summary judgment on this claim.

## III.   Conclusion.

Because the Court concludes Napreljac's conduct during discovery does not rise to the extreme level required to warrant dismissal of his action, JQH's Motion to Dismiss (Clerk's No. 30) must be **denied**.

Beginning with Napreljac's disability discrimination claim, the Court concludes Napreljac has not generated a genuine issue of material fact with respect to whether he was disabled under the ADA at the time of his termination, and the Court must conclude he does not suffer the required disability.  Even if he met that initial threshold, the Court concludes Napreljac has been unable to demonstrate the proffered legitimate, nondiscriminatory reason for his termination was a pretext for unlawful discrimination.  As a result, JQH is entitled to summary judgment on Napreljac's disability discrimination claim.

Because Napreljac has not resisted JQH's request for summary judgment on his race discrimination claim, and the Court finds judgment as a matter of law on that issue appropriate, JQH is entitled to summary judgment on that claim.  JQH is also entitled to summary judgment on Napreljac's national origin discrimination claim because Napreljac has been unable to demonstrate a causal link between his national origin and his termination.  Because a causal link is lacking between his termination and any past or future workers' compensation claims on Napreljac's behalf, his discharge in violation of public policy claim must fail as well.  Finally,

because the record does not contain a genuine issue of material fact with respect to whether JQH's conduct was outrageous, JQH is entitled summary judgment on Napreljac's intentional infliction of emotional distress claim.

Based on the foregoing discussion, Napreljac's Motion for Partial Summary Judgment (Clerk's No. 31) must be **denied**, and JQH's Motion for Summary Judgment (Clerk's No. 30) must be **granted**.  The Court **denies** JQH's Motion to Strike (Clerk's No. 51) as moot.[37]  Based upon the foregoing determinations, the above-entitled action is **dismissed**.  The Clerk of Court is directed to enter judgment against the Plaintiff and in favor of the Defendant.

**IT IS SO ORDERED.**

Dated this 8th day of November, 2006.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT

---

[37] At the time of the oral argument, the Court advised that the Motion to Strike was not technically sound, and that the issue went to the weight the Court would accord the expert opinion in the summary judgment analysis.  Because the outcome of the parties' Motions for Summary Judgment resolves all of Napreljac's claims even if Van Ahn's report is included, JQH's Motion to Strike is denied as moot.